Argued February 9; affirmed June 13, 1939

# SHERRARD *v.* WERLINE ET AL.

(91 P. (2d) 344)

Department 1.

*Oscar Hayter*, of Dallas, for appellants.
*Bruce Spaulding*, of Dallas, for respondent.

ROSSMAN, J. This is an appeal by the defendants from a judgment of the circuit court, based upon the verdict of a jury and entered in an action which was predicated upon a charge that the defendant, John Werline, the eighteen-year-old son of the other defendant, Eunice Werline, so negligently drove a car, owned by the latter, that it ran into and injured the plaintiff who at the time was crossing a public street on foot.

The defendants present seven assignments of error. The first is based upon the denial of their motion for a nonsuit; the second upon a ruling which denied their objections to a hypothetical question; the third upon the denial of their motion for a directed verdict; the fourth, fifth and sixth upon instructions given to the jury; and the seventh upon the court's refusal to give an instruction requested by them.

Upon this appeal the defendants do not contest the plaintiff's injury, the defendants' negligence, and the family use to which the car was being applied. The first and third assignments of error are, therefore, ·

predicated upon the defendants' charges that the plaintiff was guilty of contributory negligence.

The accident occurred November 14, 1937, at 5:45 p. m., on North Main Street in the city of Independence. The night was dark, a drizzling rain was falling, the pavement was wet, the street lights were burning, and automobiles were using their lights. The course of Main street, which carries a fair volume of traffic, is north and south. The street is 80 feet wide with the central 22-foot area paved with roughtop material. Beyond the pavement on both sides are gravel shoulders which extend to the curb or sidewalk line. At the place in Main street with which we are concerned, Oak street, 60 feet wide, enters from the west, but does not cross Main street. The intersection is illuminated with an overhead street light which was burning at the time of the accident.

■ So far the facts are free from dispute. From now on we shall state many that the defendants do not concede, but, since substantial evidence presented by the plaintiff supports them, we are compelled, for the purposes of the motions for a nonsuit and a directed verdict to assume their truth.

At the hour above mentioned the plaintiff reached the aforementioned intersection in an automobile driven by one Floyd Nelson, which stopped on the gravel shoulder of the east side of Main street opposite the south curb of Oak street. The south sidewalk of Oak street does not cross Main street, but the car driven by Nelson stopped in such a position that after the plaintiff had alighted from it and had walked around its rear he was directly east of the sidewalk on the south side of Oak street. It was his purpose to cross Main street at that point and then walk west on the sidewalk

just mentioned. At that time the defendants' car, a 1930 Model A Ford, equipped with four-wheel brakes, and driven by the defendant John Werline, was headed south and was some distance north of the Nelson car. Hereafter by the term "defendant" we shall refer to the son, the driver of the car.

As the Nelson car drew up to the above place the plaintiff looked north along Main street, but saw no car approaching from that direction; as a witness, he expressed the belief that his view at that moment may have been obstructed by a car which was a block or so ahead. As he stepped to the ground he saw the lights of a car approaching from the north which turned out to be the defendant's car. He estimated that it was four or five blocks away. The blocks in that part of Independence are 240 feet long and the intersecting streets are 60 feet wide. Hence, four blocks are 1200 feet and five blocks are 1500 feet. The plaintiff testified that the car he saw was so far away he believed he had plenty of time to cross the street. After alighting he walked to the rear of the car, paused for a moment until it had pulled on ahead and then looked along the course of the street again. To the south he saw a car approaching, but believed that he could cross the street before it reached him. We add that this car was not involved in the accident. As a matter of fact, it did not reach the intersection until the defendant's car had collided with the plaintiff. It then carried the plaintiff to a physician's office. When the plaintiff observed the car just mentioned he also looked again to the north but at that time Nelson's car obscured his vision and he did not see the defendant's car. He then proceeded to cross the gravel shoulder. The following are his words: "Just stepped out on the highway and

looked down the highway and saw I had plenty of time
to go across before that car was coming south.'' He
swore that as he crossed he used the unmarked cross-
walk. We again quote from him: ''Well, I wasn't in no
hurry; just walked across. Thought I had plenty of
time until I got to the center of the highway and then
his (defendant's) car passed the car (Nelson's) I got
out of and then I whirled around and just made a couple
of steps and he hit me.'' He claimed that as he reached
the yellow line which marked the center of the pavement
the defendant's car ''was at least three or four feet
on the east side of that yellow line,'' and that it was
approaching at a high rate of speed. Next, he testified:
''When I seen I couldn't get across the street ahead
of it, I turned around and started back.'' He declared
that he hesitated for an instant when he saw the car
rushing upon him, and, asked how long he hesitated,
replied, ''Well, it is hard to tell, you know; kind of
startled you for a second and when I seen I couldn't
make it across, I turned around.''

He thought that the Nelson car from which he had
alighted a moment or two previously and which after
discharging him had proceeded northerly may have
obstructed his view to the north as he approached the
center line and that it may have thus prevented him
from seeing defendant's car. He swore that when he
reached the yellow line he saw the defendant's car about
150 or 200 feet away. He was not sure of the exact
distance. We quote from his testimony: ''I stopped
as soon as I seen the car. I was right in the center of
the pavement, right on that yellow line.'' He testified
that he had driven cars since 1918 and that he was able
to estimate their speed. He swore that the defendant
''was coming pretty fast,'' and when asked to make

his answer more definite, replied, ''Around fifty miles an hour, maybe better.'' As already indicated, he testified that he hesitated for an instant when he saw the car bearing down upon him ''and then I turned around. I saw I couldn't make it across and I turned and started back and I made my second step back when it hit me.'' The car's front bumper struck the plaintiff's left leg, fracturing the bone in so many places that it was necessary to amputate it. He claimed definitely that when he was struck he was well east of the center line; that is, upon the car's left side of the pavement. We quote one of his answers: ''I know I was at least three or four feet on the east side of that yellow line, and as I looked around the lights were right almost on me.'' It will be recalled from the quoted language that the plaintiff described the defendant's car as ''at least three or four feet on the east side of that yellow line.'' The east side of the line was the left or wrong side for the car. No signal was given of the car's approach.

Although the plaintiff was 65 years of age, it seems to be conceded that he was quick upon his feet. The defendants' brief describes him thus: ''The plaintiff was an active, athletic man, possessed of all his senses and at the time of the accident was in good health.''

Floyd Nelson testified that after the plaintiff alighted from his car he (Nelson) immediately drove on and intended to turn left at the next block, but that after he had given the signal and reached the intersection he abandoned his intention ''because a car was coming too fast, so I couldn't make the turn, so I went another block.'' The car to which he referred was the defendant's. Nelson was not able to estimate defendant's speed in terms of miles per hour, but said that

it was "coming fast." Carl Groth, who lived in a house adjacent to the intersection where this accident occurred, testified that while he and his wife were in their home "we heard the noise of a car striking something, and the wife says, 'Well, there is a wreck.' And I said, 'No, it didn't sound like a wreck. It sounded too dull.' Sort of a dull thump." He swore that he plainly heard this sound in his home. Upon rushing out he saw the plaintiff lying upon the pavement "a foot or foot and a half, something like that," east of the yellow line and about fifteen to twenty feet south of the Oak street sidewalk. The defendant's car was standing at the end of his (Groth's) driveway. Later, he measured the distance from his driveway to the south line of the intersection and found that the distance was approximately 116 feet. He was sure that his error, if any, did not amount to more than three feet. The next morning he returned to the scene of the accident and observed a pool of blood which had collected in a small hole in the pavement east of the yellow line. Elmer Lawrence, whose car the plaintiff had observed approaching from the south just before he (plaintiff) undertook to cross the street, arrived at the scene of the accident immediately after it had occurred. He testified that the plaintiff "was lying a little to the east of the highway line, * * * probably twelve or fifteen feet" south of the southerly edge of the Oak street sidewalk. W. L. Powers, who lived in a house near the intersection, upon hearing someone in the street cry out "Help!" rushed out and observed the plaintiff lying in the street twelve to fifteen feet south of the Oak street sidewalk and "about a foot, I guess, east." This witness's son Raymond swore that he heard "a crash" and upon rushing out with his

father saw the plaintiff "lying a little bit east of the line; about a foot or two." Bert Mosier, chief of police of Independence, testified that the morning after the accident he saw a blood spot in the pavement fourteen feet south of the aforementioned sidewalk and three feet east of the yellow line. He testified that a few minutes after the accident the defendant John Werline told him he was "right up within six feet of him (plaintiff) before he seen him * * * that he seen him and he tried to swerve to the—he pulled his car to the right and tried to miss him * * *. He said he stopped as soon as he could after the accident." Ray Howard, another police officer of Independence, testified that the day following the accident he observed at its scene a blood spot in a depression "three feet east of the yellow line and about fourteen feet south of the Oak street sidewalk." Dr. George C. Knott, the physician to whose office the plaintiff was brought immediately following the accident, swore that the blow was received principally by the plaintiff's left leg four or five inches below the knee, and that it resulted "in a compound comminuted fracture" which was so complete that until splints had been applied the plaintiff's foot "would weave around in any direction" when the leg was moved. He also testified: "The blow must have been very severe not only to break the bones as it did, but to kill this overlaying tissue * * *." The plaintiff testified that some time after the accident the defendant John Werline admitted that "just before he hit me he slapped his brakes on and turned short to the right; almost upset his car."

The foregoing testimony was presented by the plaintiff. The defendant testified that he was not driving on the left side of the pavement, and then stated: "The

first thing I saw he (plaintiff) had thrown up his arms and I could see his gray hair flashing" in the beams of the headlights. He said that at that time he had just passed the Nelson car and that its headlights had blinded him. He added, "He (plaintiff) threw up his arms and tried to jump back." He thought that he saw the plaintiff only six to ten feet before his car struck him, and that the plaintiff "was just over the center line a little ways. * * * I imagine it was a foot or two" (west of the center line). Proceeding he said: "I suppose I tried to put on the brakes or turn over. * * * I tried to pull over; that is the first thing I thought of." He added, "I applied the brakes too." After stopping his car he hurried to the place where the plaintiff was lying upon the pavement, and declared that the plaintiff's head "was close to about two and one-half to three feet" east of the yellow line, but that his feet were a little nearer to it. Raymond Housley, his 19-year-old companion, testified that they had just passed the Nelson car about 25 feet north when he saw the plaintiff six or eight feet ahead. The witness continued: "He (plaintiff) was walking—let's see, he was walking west and just as he got about—oh, two feet across the line, he started to turn and turned just to the north; turned to go back and swerved to the right." At that moment the crash occurred. This witness testified that after the collision the plaintiff was lying "a little on the right-hand side, on the east side of the line though." Oscar Moore, another witness called by the defendant, testified that he measured the distance from the south line of the south sidewalk to the aforementioned flaw in the pavement where witnesses had seen the small pool of blood, and found it was twenty-two feet and eight inches. The distance from the flaw

to the east side of the road, according to his measurement, was seven feet and six inches. Fred W. Calef, one of the defendants' attorneys, testified that he, too, made the above measurements and found that the first distance was twenty-two feet and five inches. The distance from the yellow line to the flaw in the pavement, according to him, was three feet.

The plaintiff testified that when he was hit, "I went right over backwards; right back over and—well, I can't say for sure, but I think that my arm hit the hood." The testimony of the defendant and of his companion also indicated that the plaintiff, when hit, fell backward. We do not assume from this that the plaintiff was projected in a northerly direction, but that the force of the blow scooped him up and that he fell to the ground.

The defendants, in arguing in support of the assignments of error, which are based upon the denial of their motions for a nonsuit and for a directed verdict, contend that the evidence shows that the plaintiff failed to take an adequate view to the north before he undertook to cross the street. It will be observed from the foregoing that he mentioned four views which he says he took. His first view was taken while he was seated in Nelson's car. He then saw nothing approaching from the north but believed that his view may have been obstructed by a car a block ahead which was going north. His second view was taken as he stepped from the car to the ground. At that time he saw the defendant's car four or five blocks (1200 to 1500 feet) ahead and felt sure that the distance was so great that he could cross in safety. His third view was taken as he approached the paved portion of the street. At that time he saw the Lawrence car to the south, but the

Nelson car was then twenty or forty feet north and partially obstructed his view in that direction. His fourth view was taken as he neared or stepped upon the yellow line. While stating that he could not be accurate, he thought that at that time the defendant's car was possibly 150 or 200 feet to the north.

As the plaintiff proceeded to cross the street it was his duty to employ due care for the protection of his own safety. This included a duty to avoid conduct which would make it impossible for drivers who were operating their cars with reasonable care to avoid striking him. The plaintiff had a right to assume, in the absence of information to the contrary, that all cars would conform to the requirements of our laws and would be operated in a prudent manner. And since our laws (1931 Session Laws, ch. 360, subd. 38 (§ 55-2314, Oregon Code, 1935 Supp.)) provide that "the driver of any vehicle shall yield the right of way to a pedestrian crossing the roadway within any * * * unmarked crosswalk at the end of a block * * *," the plaintiff had a right to believe, until indications to the contrary appeared, that approaching vehicles would permit him to pass in safety. We remind ourselves that a street light overhead was burning thereby lending assurance to the plaintiff that drivers of approaching cars could see him. However, the section of our laws just mentioned continues: "The provisions of this section shall not relieve the driver of a vehicle or the pedestrian from the duty to exercise due care." Therefore, it was the plaintiff's duty to be alert. Having the right of way he could assume that approaching motorists would yield it to him, but he had no right to engage in the assumption if it became evident that the right of way would not be yielded. At that point

it would become incumbent upon him to look out for his own safety. These principles of law, in our opinion, control the issue of contributory negligence. The facts favorable to the plaintiff, in addition to those summarized in the last paragraph, may be epitomized thus: (1) The plaintiff was upon a crosswalk; (2) he had not yet crossed over the yellow line into the west half of the street; (3) the defendant's car was proceeding upon the east, or, what was for it, the wrong side of the street; (4) the moment before the plaintiff was struck he had retreated two steps further into the east half of the street; and (5) he did not lunge forward and backward in an uncertain manner when the defendant's car emerged from behind the Nelson car, but promptly retreated.

The defendants argue that the physical facts show that the plaintiff was not upon the east half of the street when their car ran into him. The plaintiff testified positively that the defendants' car was four or five feet east of the line as it approached, and that he was struck after he had retreated two steps east. We know of no physical facts which contradict him. The testimony of the defendant, his companion Raymond Housley, and those who saw the plaintiff lying upon the pavement indicates that he was lying east of the yellow line. Some of those witnesses thought that he was one foot east of the line, while others placed distance as much as three feet. Those who saw the pool of blood, and the two who measured the distance from the hole in the pavement in which the blood had collected, placed the spot from one and a half to three and a half feet east of the yellow line. The defendant swore that he swerved his car sharply to the right when he observed the plaintiff six to ten feet ahead. That

being true, the blow imparted by his car's bumper to the plaintiff's body would more likely have carried or knocked the plaintiff to the right than to the left. Notwithstanding this fact, the plaintiff, as we have seen, was found to the left of the center line. All of these circumstances, as well as the plaintiff's direct testimony, certainly warrant a belief that the plaintiff must have been to the east of the line when he was struck. We can not say that if the jury found that the plaintiff was run down when he was upon the east half of the thoroughfare, it lacked support for its conclusion.

As the defendants point out in their comprehensive brief, it was the plaintiff's duty to have made reasonable observations along the course of the street as he approached the scene of danger. The law refuses to specify any precise number or designate the place. The duty continues so long as danger is present and is most exacting as the indications of possible injury become more apparent. But this is not an instance in which the injured person failed to observe the approaching car: He actually saw it when it was four or five blocks in the distance and when he had seventy-five feet or less to walk in order to reach the opposite sidewalk. He saw the car again (as he neared the center of the street) when he was where he had a right to be and where the defendant had no right to drive. He swore that when he first observed the car he felt certain that he could safely cross. If his estimate of its speed (when he saw it the last time) as fifty miles per hour was correct, then the jury had an explanation for the fact that the car was upon the plaintiff sooner than he had anticipated. The defendants claim that the physical facts show that the car could not have traveled 150 to 200 feet while the plaintiff hesitated a moment, turned

around, and stepped two feet back. But the plaintiff stated that his reference to the 150 to 200 feet was only an estimate. In the emergency which confronted him it seems manifest that he could gain only sensations or perceptions—and not make measurements. It seems evident that the distance was less than 150 feet. We can not say that the facts compelled the jury to conclude that his views down the street were insufficient in number and made without the required degree of care.

The defendants rely strongly upon *Moseley v. Mills*, 145 Wash., 253, 259 P. 715. However, in that case the injured pedestrian took only one view before undertaking to cross the street. She was injured upon the half of the street where the motorist properly belonged. The place of the impact was within two feet of the curb. We believe that *Bracht v. Palace Laundry Co.*, 156 Or. 151, 65 P. (2d) 1039, is more in point. As a matter of fact, the facts of that case were more favorable to the driver than are those in the present case. There the driver was upon the part of the street which was his right half, and the pedestrian's view was, in part, obscured by her upraised umbrella.

It seems useless to set forth herein a review of the large number of authorities cited by the parties. None of them involves facts exactly like those in the present instance. Each of them, in determining the issue of the pedestrian's contributory negligence, employed none other than the principle of due care. We repeat, the plaintiff was upon the crosswalk where he had a right to be; he was not tarrying; before crossing he had seen the defendant's car in the distance; and before stepping upon the yellow line he had seen it again. No citation of authority, in our opinion, is essential

to support the statement that these facts do not indicate contributory negligence. In our opinion, the motions for a nonsuit and a directed verdict were properly denied.

 The next assignment of error is based upon a ruling which permitted the plaintiff to ask Walter Lansing, a captain of the Oregon State Police, the following question: "Assuming that a car on a level or substantially level portion of pavement, which is rough-topped, hard surface pavement, having a gravel shoulder along the side of it, and the automobile assumed to have good brakes and brakes as required by law—four-wheel brakes, 1930 Ford coupe automobile—and that the brakes were applied at the south boundary of an intersection, the car traveled 113 feet after their application, would you be able to tell us whether or not—just before you answer, give him time to object—would you be able to tell us whether or not the car was traveling in excess of twenty-five miles per hour?" The qualifications of Captain Lansing to answer this question were not challenged. The defendants' objection to the question, as stated in their brief, follows: "On the ground that there was no evidence as to where the brakes were applied or as to the distance the automobile traveled after the brakes were applied." In determining the merits of this objection some of the facts to which we have already adverted must be considered. We revert to the testimony. Groth testified that the distance from his driveway where he observed the defendant's car immediately after the accident to the south line of the intersection was not less than 113 feet. The plaintiff testified that some time after the accident the defendant spoke to him about his brakes, and we now quote from the plaintiff's testimony: "He said just before he hit

me he slapped his brakes on and turned short to the right; almost upset his car.'' Mosier, whom we have already mentioned, testified that a few minutes after the accident the defendant ''said he stopped as soon as he could after the accident.'' The defendant testified that the moment when he saw the plaintiff, ''I tried to pull over'' and ''I applied the brakes too.'' Some time after the accident the defendant called at the office of the plaintiff's attorney where a conversation took place. Concerning it he was questioned and answered as follows: ''Q. Now, on this occasion when you came to my office with Mr. Mosier you told me, didn't you, that you stopped the car just as soon as you could after the accident? A. I did.'' About two hours before the accident the defendant had been in Portland and admitted that while there his brakes, which were the four-wheel type, were tightened. It will be observed from the foregoing that the hypothetical question was based upon testimony which is in the record.

However, the defendants argue that as a matter of fact the car was not stopped as quickly as could have been done. Both the defendant and Housley testified that as the car approached the Groth driveway Houseley told the defendant that he ought not to stop upon the roadway, but should proceed to the Groth driveway which was nearby. This, they said, was done. This testimony was not given until after the hypothetical question had been asked and answered. So far as we know the plaintiff had no reason to anticipate that this subsequent testimony would be given. The defendant offered no testimony to indicate how far he had driven to reach the driveway after he had virtually come to a stop, but said that he shifted into second gear. Thus, he did not contradict the above admissions with testi-

mony disclosing distances. It was not necessary that the hypothetical question be based upon the part of the testimony most favorable to the defendants. A party is entitled to the expert's opinion ''on any combination of facts that he may choose.'' Wigmore on Evidence (2d ed.) § 682. Questions are permitted in hypothetical form upon data which it may reasonably be assumed the jury will accept as true. If the premise upon which the question is based is rejected by the jury as untrue, the expert's opinion will, of course, be disregarded. Wigmore on Evidence (2d ed.) § 680. Upon cross-examination of Captain Lansing various hypotheses were employed concerning the stopping of cars. We feel certain that unless the jury believed that the car's brakes had locked its wheels for a distance of 113 feet, they knew that they were not bound by the witness's answer which was, ''I would say he was traveling much in excess of twenty-five miles an hour.'' We believe that the objection was properly overruled. This conclusion is not at variance, in our opinion, with anything said in *Hefling v. Heintz*, 157 Or. 542, 72 P. (2d) 44, which the defendants cited in support of their contention.

The defendants argue that the trial judge erred when he instructed the jury as follows:

''In the event you find that the plaintiff, William Sherrard, at the time he arrived at the center of highway or at any other time involved in this case, was confronted by a peril or danger without negligence on his part, as shown by the evidence in this case, I instruct you that more hasty and violent action was to be expected than would be natural at quiet moments, and in that event the plaintiff's conduct must be judged with reference to the threat of appearances at the time and not by the cool estimate of actual danger formed

by outsiders after the event. That is what is known as the 'Sudden Peril or Emergency Doctrine' and, of course, a person cannot invoke it if he places himself in a position of sudden peril or emergency by his own negligence. It is only if he finds himself in such a position and not as a result of any negligence upon his own part."

The defendants excepted on the ground that the instruction was an abstraction and was not concerned with any pleaded matter. Their brief states:

"There is no contention that this instruction is not correct as a statement of an abstract proposition of law. If the pleadings had been framed in such a manner as to present the issue * * * this instruction would doubtless be proper."

The complaint alleged that as the plaintiff reached the place in the unmarked crosswalk intersected by the yellow line the defendant negligently drove his automobile "towards said crosswalk, and before the plaintiff could sufficiently retrace his steps back towards the east edge of said pavement and out of the course of said automobile, the said defendant drove the same suddenly and violently into and against the plaintiff's person * * *." The answer, besides denying this averment, alleged: "Plaintiff at said time got out of an automobile which had just stopped on the east side of said highway. Another automobile at that time was being driven in a northerly direction along said highway and just the instant that it passed the parked car plaintiff suddenly and unexpectedly and without giving any heed to said automobile driven by the defendant John Werline or any warning to said defendant of his intention to cross said highway emerged from behind the parked car and the car then passing from the south

and stepped directly in the path of the automobile driven by the defendant John Werline * * *. Plaintiff was so near the defendant John Werline's automobile when he so started across the said highway that it was impossible to stop or turn said automobile or prevent the plaintiff from colliding with it * * * and said collision was an unavoidable accident so far as the defendants, or either of them, were connected therewith. * * * At the time and place of said collision and immediately prior thereto the plaintiff was careless and negligent in the following particulars, to-wit: * * *.'' This averment is succeeded by five specifications which charge that the plaintiff failed to maintain a proper lookout; stepped out suddenly from behind an automobile into the course of the defendant's car; failed to permit the defendant's car to proceed; failed to yield the right of way to the defendant; and failed ''to exercise reasonable or ordinary care for his own safety.'' These averments are denied in the reply.

The defendants' brief argues at length this assignment of error and in support of its contentions cites many authorities. We deem the issue presented by this assignment of error one which is comparatively simple and do not believe that the decisions cited by the defendants dealt with similar issues. The challenged instruction dealt with the plaintiff's, and not the automobile's, conduct. Therefore, it dealt with the defendants' charge that the plaintiff was guilty of contributory negligence. The latter charge was made in the answer and the allegations concerning it were denied in the reply. Apparently the plaintiff had anticipated that a charge of contributory negligence would be made, and sought to meet it in the complaint by averring that he had acted in an emergency. Clark on Code Pleading,

p. 167, after discussing decisions that dealt with anticipatory defenses, states:

"Since the object of pleading under the code is to give adequate notice to the opposing party and to the court of the case upon which the pleader relies, it would seem that, the earlier the pleader more completely sets forth his position, the more the pleading objective has been obtained. Hence, the latter rules, following the equity rather than the common-law practice, would seem the more desirable under code pleading."

From 21 R. C. L., Pleading, p. 491, § 55, we quote:

"But while a party is not ordinarily bound to anticipate a defense it is often proper for him to do so. A plaintiff may in many instances elect to set forth all the facts and submit the entire case upon questions of law, following, in this course, where the practice permits, the rule which has always obtained in equity that a defense may be anticipated."

In *Little Nestucca Toll-Road Co. v. Tillamook*, 31 Or. 1, 48 P. 465, 65 Am. St. Rep. 802, and *Benicia Agricultural Works v. Creighton & Quivey*, 21 Or. 495, 28 P. 775, 30 P. 676, the court pointed out that a pleader is not bound to anticipate his adversary's defenses. We believe that the pleadings presented an issue as to whether the plaintiff acted in an emergency when the defendant's car approached him. It is true that an averment which should have been in the reply was embraced in the complaint, but no motion was filed against this averment and no difficulty was experienced during the trial on account of the unorthodox style of the pleadings. The challenged instruction was based upon testimony received without objection. The defendants do not contend that they lacked sufficient information concerning the issues. Nor do they argue that they

would have presented additional evidence had the paragraph which we quoted from the complaint been incorporated in the reply. The purpose of instructions is to state to the jury the principles of law governing the facts revealed to the jury by the evidence. This assignment of error, we believe, possesses no merit.

The next assignment of error challenges the following instruction:

"A person driving an automobile is driving a machine capable of doing great damage if not handled in a careful and prudent manner. Therefore, it takes more care on the part of the driver of an automobile to amount to reasonable care in a situation than is required of a pedestrian walking across a highway."

The instructions also stated:

"The driver of an automobile is only bound to exercise reasonable care; that degree of care which persons of ordinary caution exercise under like conditions. The standard of care is not that which the most careful person exercises, nor that degree of care which the least careful person exercises, but it is that degree of care which an ordinarily prudent person exercises. * * * The same duty to exercise reasonable care and caution for his own sake that rested upon the defendant John Werline in the operation of the automobile, also rested upon the plaintiff."

The criticized instruction, apart from immaterial variations, was also employed in *Bracht v. Palace Laundry Co.*, 156 Or. 151, 65 P. (2d) 1039; *Cline v. Bush*, 152 Or. 63, 52 P. (2d) 652; *Krieger v. Doolittle*, 142 Or. 122, 18 P. (2d) 1041; *Vandevert v. Youngson*, 140 Or. 77, 12 P. (2d) 1029; and *Hinckley v. Marsh*, 124 Or. 1, 263 P. 886. *Bracht v. Palace Laundry Co.*, supra, states in

the following language the essence of the four decisions last cited:.

"This requested instruction is in language identical with that approved by this court in the case of Hinckley v. Marsh, 124 Or. 1, (263 P. 886), with the exception that the word 'across' is substituted for 'along.' In the case cited it was held that the giving of this instruction did not constitute error. The question next arose in Krieger v. Doolittle, 142 Or. 122 (18 P. (2d) 1041), in which the instruction objected to included, among other things, exactly the same language used in the instruction requested in the case at bar. It was there held that since the objection was to the entire instruction and part of the charge was correct in view of the decision in Hinckley v. Marsh, supra, no reversible error was committed in giving it. In Cline v. Bush, 152 Or. 63 (52 P. (2d) 652), error was predicated on the court's failure to give to the jury a requested charge almost identical with that excepted to in Krieger v. Doolittle, supra. We there stated that the failure to give the requested instruction was not erroneous, and the decision on that point in Krieger v. Doolittle, supra, was explained with reference to the exception there taken. Neither of the last two decisions of this court on the subject, however, adversely criticized language such as that employed by the requested instruction here involved."

The requested instruction now before us is a duplicate of one refused in the circuit court in the Bracht case. Concerning it this court, in the Bracht decision, said:

"Although according to our previous holding it would not have been erroneous to give this requested instruction, nevertheless we do not believe that the failure to give it would constitute reversible error. Giving or failing to give the instruction as requested would not have affected the jury's determination of the issues in the case."

In *Hinckley v. Marsh,* supra, Mr. Justice Coshow, in sustaining the instruction, stated:

"The instructions objected to by appellants, when considered with the context, a part of which is quoted above, were not objectionable. Every ordinary man exercises greater care when handling a dangerous instrumentality than when handling an instrumentality not capable of doing bodily harm. What would be ordinary care in dealing with sand and gravel might be gross carelessness in handling dynamite. The instructions taken as an entirety clearly define the relative obligations and privileges of automobile drivers and pedestrians at street crossings."

In sustaining the circuit court's refusal to employ the instruction, Mr. Chief Justice Campbell, in *Cline v. Bush,* supra, expressed disapproval of the instruction in the following words:

"The amount of care required by both the pedestrian and the driver is such care as an ordinary careful prudent person would exercise under similar conditions and circumstances, and commensurate with the danger to be apprehended. The court fully instructed the jury in the instant case as to the care required by the plaintiff as well as by the defendant."

Let us see what other courts have said concerning the same issue. From *Pryor's Adm. v. Otter,* 268 Ky. 602, 105 S. W. (2d) 564, we quote:

"Each party must recognize the rights of the other and exercise reasonable care to avoid injuring the other and of being injured himself. But owing to inequality of their situations and the disparity in their respective capacities to inflict injury, the requirements of ordinary care are different—the term being a relative one, dependent in its application upon the conditions and the degree of circumspection and action demanded by those circumstances. So the elements constituting ordi-

nary care or reasonable precaution on the part of a motorist are materially different from those of the pedestrian.''

From *Aiken v. Metcalf,* 90 Vt. 196, 97 Atl. 669, we quote:

''Each was bound to exercise due care; but the degree of watchfulness which this rule imposed upon them was not the same. The defendant was driving a machine, which on account of its speed, weight, and quietness was capable of doing great damage, and the law puts upon one so situated a greater and more constant caution. He was bound to exercise care commensurate with the dangers arising from a lack of it.''

In *Minor v. Stevens,* 65 Wash. 423, 118 P. 313, 42 R. A. (N. S.) 1178, the court said:

''It is hardly possible to lay down a fixed rule in this class of cases; for, as has been said, negligence is a relative and comparative term. * * * Although a higher degree of care rests upon the driver of a vehicle, because of the dangerous instrumentality which he controls, yet it is universally held that the right to the street lies in both parties.''

In *Dawson v. Lalanne,* 22 Cal. App. (2d) 314, 70 P. (2d) 1102, the district court of appeals states the essence of several California decisions which dealt with problems substantially similar to the one before us. We quote:

''Plaintiff complains of the ruling of the trial court in refusing to give to the jury an instruction in the following language: 'You are instructed that the plaintiff and the defendant were both chargeable only with the exercise of ordinary care, but a greater amount of such care was required of the defendant at the time of the accident in question by reason of the fact that he was driving and operating an automobile, which is an instrumentality capable of inflicting serious and often

fatal injuries upon others using the highway.' This instruction clearly states the rule of law applicable to the facts of the case and has been approved in a number of cases. In Weihe v. Rathjen Mercantile Co., 34 Cal. App. 302, 167 P. 287, 288, the court said: 'Nor do we think the court misdirected the jury in reading to them from the case of Raymond v. Hill, 168 Cal. 473, 483, 143 P. 743, 747, as follows: 'While both parties are charged with the same degree of care, * * * the amount of care exacted of the driver of a motor vehicle is far greater than the amount of care exacted of the foot passengers.' As said by counsel for the plaintiff, the degree of care exacted of both users of the highway is the same; the amount of care must of necessity vary in order that the degree may not. The driver of a motor vehicle—a dangerous instrumentality capable of inflicting fatal injuries—is charged with a greater amount of care than the pedestrian, in order that he may be bound to the same standard of ordinary care.' In Vedder v. Bireley, 92 Cal. App. 52, 267 P. 724, the court in reversing a judgment for the defendant held that an instruction should have been given which was framed in the same language as the one under discussion. Pinello v. Taylor, 128 Cal. App. 508, 17 P. (2d) 1039, 1041, is also a case in which a pedestrian was struck by an automobile, and the court in reversing a judgment in favor of the defendant held that the following instruction should have been given: 'I instruct you that while both parties (the automobile driver and the pedestrian) are charged with the same degree of care, the amount of care exacted of the driver of a motor vehicle is far greater than the amount of care exacted of a foot passenger.' ''

See to the same effect *Brown v. Blair*, 26 Cal. App. (2d) 613, 80 P. (2d) 95.

The principle which was employed in all of those decisions was the determining factor in *Maletis v. Portland Traction Co.*, 160 Or. 30, 83 P. (2d) 141, wherein this court approved an instruction which told the jury

that if an infant, two years of age, is exposed to danger "it is the duty of every person approaching him to use all care and caution that such person can command to avoid injury to such infant." In stating that conclusion the decision quoted from *Wallace v. City & Suburban R. Co.*, 26 Or. 174, 37 P. 477, 25 L. R. A. 663, the following:

"The term 'ordinary care' is a relative term, always dependent on circumstances. What would be ordinary care in one case would be the grossest neglect in another. Thus, if an adult should be seen on a street car track, it might be assumed that he would leave the track before the car reaches him, but no presumption can be indulged in as to the conduct of an infant of tender years; and hence when the court said that, if the servants of defendant saw this child on the track, they were required to use more than ordinary diligence to prevent injury, it was only, in effect, saying that the age of the child required the highest degree of care on the part of the servants of the defendant, and nothing short of that would be ordinary care, under the circumstances."

Let us now revert to the challenged instruction. Its first sentence is nothing more than the statement of a fact universally recognized as true. The second sentence was apparently employed for the purpose of showing that "reasonable care" is not composed of a fixed number of units as, for instance, a dozen, but that the amount of care which constitutes a "reasonable" amount varies and is controlled by the circumstances like the flow and ebb of the tides. We believe that when an explanation has been made of the demands of due care and when the jury has been informed that both parties must exercise reasonable care, the instruction criticized by the defendant may be employed for the purpose of illustrating still further the fact that the

diligence to be exercised is dependent upon the attendant circumstances. We are satisfied that a sufficient statement of the demands of due care may be given without resort to this instruction and, hence, do not say that it must be employed in all instances, but, as already indicated, it may be employed for the sake of clarity. This assignment of error reveals no error.

Next, the defendants contend that error was committed when the trial judge failed to employ an instruction requested by them which stated: ''This right of way (if plaintiff did have the right of way) is not an absolute right, but * * *''. Then followed language which pointed out that a pedestrian favored by the right of way must nevertheless employ due care. The instructions that were given were long and detailed. Defendants' brief states concerning the principle of law which formed the basis of this requested instruction: ''A review of the instructions reveals that there was some mention of this rule of law in the instructions to the jury * * *. At page 310 of the transcript the judge instructed the jury that neither party was relieved of the duty to use due care by having the right of way. A similar instruction was given at pages 314-315 in which the jury was advised that after determining which party had the right of way the jury was still bound to determine whether the parties had used due care. It is to be noted that the explanation is not so full as that requested * * *. At page 317 * * *. On the same page the jury was instructed that the right of way conferred by statute to either the pedestrian or the operator of a car was not exclusive and that it could not be exercised without due regard for the surrounding conditions and the safety of others. At page 319-C of the transcript the jury was instructed at length as

to the plaintiff's duty to keep a lookout''. We observe that the instructions further told the jury that the statute which confers upon the pedestrian the right of way ''further provides that the provisions of this section shall not relieve the driver of the vehicle, or the pedestrian, from the duty to exercise due care.''

The instruction prepared by the defendants' counsel is couched in plain language and correctly states the law. It could well have been employed. But we are satisfied that the language of the trial judge was a good substitute for it. We believe that the instructions afforded the jury a sufficient understanding of the duties owed by a pedestrian when he crosses a street, either at a crosswalk or other place. This assignment of error reveals no error.

The last assignment of error complains because the instructions told the jury: ''There are several allegations of negligence in plaintiff's complaint, but if one allegation of negligence is proven which is a proximate cause of the injury, that is sufficient.'' One of the charges of the complaint averred that the defendant failed to give a warning signal of the approach of his automobile. However, the instructions repeatedly informed the jury that negligence alone was not sufficient and that to warrant a recovery it must appear that the specific act of negligence under consideration and proved by a preponderance of the evidence was the proximate cause of the plaintiff's injury. Further, the instructions informed the jury: ''There is no statutory requirement or requirement of the law charging a person to sound a warning or horn under circumstances such as this,'' and that the duty was owed only in the event that a person of ordinary prudence under the circumstances immediately preceding the accident

would have given a signal of the car's approach. We are satisfied that this assignment of error affords no occasion for believing that error was committed.

■ The above constitutes our disposition of all of the assignments of error. We have found no error and, therefore, the judgment of the circuit court must be affirmed. The plaintiff asks that the judgment be increased 10 per cent by virtue of § 7-514, Oregon Code 1930. The recovery awards the plaintiff $8,647.22. We do not believe that the award is excessive, but we are unwilling to say that the appeal was taken without probable cause. It, therefore, follows that the penalty permitted by this section of the code should not be imposed.

RAND, C. J., and KELLY and LUSK, JJ., concur.