Argued at Pendleton October 27, reversed December 15, 1925, rehearing denied January 12, 1926.

## STATE v. E. O. WILLSON.

(241 Pac. 843.)

**Criminal Law—In Prosecution for Causing Death of Unborn Child, Court may Take Judicial Notice of Laws of Nature.**

1. In prosecution for causing death of unborn child by unlawful abortion, court, in determining whether there is sufficient proof of the *corpus delicti*, may under Section 729, Or. L., take judicial notice of laws of nature and resort to appropriate books or documents for reference.

**Criminal Law—Expert Witness in Criminal Prosecution must Detail to Jury Facts on Which He Bases His Opinion.**

2. Expert witness in criminal prosecution, though thoroughly qualified as witness, cannot give opinion without first detailing to jury facts on which he bases his opinion.

**Criminal Law — Testimony of Doctor in Prosecution for Causing Death of Unborn Child, Without First Detailing to Jury Facts on Which Opinion was Based, Held Improper.**

3. Where, in prosecution for causing death of alleged unborn child by unlawful abortion, testimony of doctor, without first detail-

———————

2. Necessity of expert's stating facts upon which opinion based, see note in 20 **Ann. Cas.** 883.

ing to jury facts on which he based his opinion, that woman he examined was pregnant, *held* improper.

**Criminal Law — Failure to Offer Evidence Held to Raise Presumption Evidence Would have Been Adverse to Prosecution.**

4.   Where, in prosecution for causing death of unborn child by unlawful abortion, object claimed to be the fetus and scraping of the woman's uterus were not clearly described or preserved and offered in evidence by state, *held*, under Section 799, subdivision 5, Or. L., to raise presumption that such evidence would have been adverse to prosecution.                                    .

**Homicide — What Proof Required to Establish Corpus Delicti in Homicide Case, Stated.**

5.   *Corpus delicti* is ·sufficiently established in homicide case, if by direct or circumstantial evidence it is shown that a human being has come to his death ·by criminal agency, irrespective of who committed the crime.

**Homicide—What Proof Required to Support Conviction in Homicide Case, Stated.**

6.   To support conviction in homicide case, in addition to proof of the *corpus delicti* evidence must prove that defendant was the criminal agent who produced death.

**Homicide—What Required to Prove Corpus Delicti of Crime of Causing Death of Unborn Child or Mother, Stated.**

7.   Before *corpus delicti* of crime defined by Section 1900, Or. L., providing that one who causes death of unborn child or mother in attempting to destroy child shall be guilty of manslaughter, is established, evidence must describe object referred to as a human being in terms applicable to a fetus as the laws of nature indicate it exists at a given age, disclosed by the testimony.

**Homicide—In Prosecution for Causing Death of Unborn Child, Evidence Held Insufficient to Prove Corpus Delicti of Crime.**

8.   In prosecution for causing death of alleged unborn child, evidence *held* insufficient to prove *corpus delicti* of the crime; that object propelled from body of prosecutrix was a fetus.

---

Abortion, 1 **C. J.**, p. 323, n. 76, p.˙331, n. 70.
Criminal Law, 16 **C. J.**, p. 764, n. 54.
Evidence, 22 **C. J.**, p. 634, n. 31; 23 **C. J.**, p. 59, n. 12, p. 142, n. 9, p. 146, n. 53 New, p. 170, n. 52.
Homicide, 30 **C. J.**, p. 139, n. 29, p. 285, n. 38, p. 287, n. 64 New, p. 296, n. 19, p. 297, n. 40 New, 42, p. 317, n. 76.

From Union: J. W. KNOWLES, Judge.

In Banc.

REVERSED.   REHEARING DENIED.

For appellant there was a brief and oral arguments by *Mr. F. S. Ivanhoe, Mr. Jesse Crum* and *Messrs. Green & Hess.*

For respondent there was a brief and oral argument by *Mr. Carl Helm* and *Mr. E. R. Ringo.*

BURNETT, J.—The defendant was indicted for the crime of manslaughter, as defined in Section 1900, Or. L., reading thus:

"If any person shall administer to any woman pregnant with a child any medicine, drug, or substance whatever, or shall use or employ any instrument or other means, with intent thereby to destroy such child, unless the same shall be necessary to preserve the life of such mother, such person shall, in case the death of such child or mother be thereby produced, be deemed guilty of manslaughter."

He was convicted and has appealed. He was charged with the use and employment of some instrument which he inserted in the uterus of the prosecutrix whereby the child was destroyed with which she was alleged to have been pregnant at the time. The prosecutrix claims that her pregnancy was the result of a single act of coition, which occurred November 9, 1923. She declared that her menstrual period was due November 18th and that the defendant used the instrument on her November 22d. On November 28th she was examined by a physician, whom she consulted, and on the 18th of December following she claims to have suffered a miscarriage as the result of the act of the defendant.

1. The principal contention for the defendant on this appeal is that there was not sufficient proof of the *corpus delicti.* The allegation of the indictment

is in substance that the defendant by his acts, enumerated in that instrument, produced the death of the said child. It becomes necessary, therefore, to a certain extent, to analyze the testimony given for the state, and in so doing we may as of right, under Section 729, Or. L., take judicial notice of the laws of nature, resorting in aid of that quest "to appropriate books or documents of reference."

In support of the indictment it became necessary for the state to prove beyond a reasonable doubt that the prosecutrix was pregnant with a child. Indeed, she could not be pregnant, in the true sense of the term, with anything but a child. It was likewise necessary to prove that the object whose life was taken was a child, unborn and undeveloped, it is true, but nevertheless a child. The testimony as to the employment of the instrument is that the prosecutrix, accompanied by her elder sister, called upon the defendant in his dental office in Elgin, on the twenty-second day of November, 1923, and he placed her in a dental chair, opened her vagina with a speculum and took a metallic rod about ten inches long, slightly curved at one end, known as a sound, and inserted the same into the womb, turning it around and causing her great pain. For the purpose of proving pregnancy, the prosecutrix testified to the sexual intercourse occurring between herself and the defendant on November 9, 1923; that her menses for that month were due on the 18th, nine days afterwards. She declared that even so early as November 20th, eleven days after the single act of coition, when she first consulted the defendant about her condition, she had "morning sickness" accompanied by vomiting; that she urinated frequently, and that her breasts were sore. On the 28th of November, six days after the

alleged operation, she consulted Dr. Landis, a physician in La Grande. Without testifying what he observed of the condition of the woman's person that indicated pregnancy, he declared dogmatically that she was advanced about six weeks in pregnancy. In passing, the query naturally arises how such a condition could arise between November 9th, or any other date in November, and the 28th of the same month, but that is the state of the testimony on that point.

2, 3. In *State* v. *Simonis,* 39 Or. 111 (65 Pac. 595), it is laid down as a rule by Mr. Chief Justice BEAN, that an expert, though thoroughly qualified as a witness, cannot be permitted to give an opinion upon facts known to him, and not communicated to the jury. He must first detail to the jury the facts on which he bases his opinion. In the testimony of Dr. Landis there is no history of distention or softening of the womb, no pigmentation of the breasts or of the vulva, no enlargement of the abdomen; in fact, he does not give any of the indications of pregnancy taught in all the works on obstetrics. All he stated about his examination on November 28th was his naked opinion that the woman was pregnant. Under the rule laid down in the case of *State* v. *Simonis, supra,* his testimony as to pregnancy may be disregarded. This medical expert witness also testified that on December 18th following he was called to attend the prosecutrix and found that she was having a hemorrhage of the womb and that he curetted that organ. This was during the day after there had passed from her in the early morning the object described by her brother and sister as hereinafter mentioned. The witness was asked this question:

"Now, what, if anything, did you procure as a result of this curettement?"

He answered:

"I obtained the products of a six weeks' concep-
tion or pregnancy, together with the usual blood clots
and membranes that go with it."

His answer does not describe the condition or tex-
ture of the tissues he obtained so that either the
jury or other experts could determine whether or
not they were the product of conception. He admit-
ted, on cross-examination, that he never at any time
saw any fetus in all his treatment of the woman in-
volved. All this testimony about the result of his
treatment is subject to the same criticism according
to the rule announced in the Simonis case, the effect
of which is that no allegation can be proved by the
*ipse dixit* opinion of any expert unless the facts or
phenomena upon which he bases his opinion are dis-
closed either by his own testimony or that of other
witnesses. The only other testimony concerning the
pregnancy of the prosecutrix was that of herself and
her sister that her breasts were sore and that she
experienced "morning sickness" and micturition. All
these are at least only possible signs of pregnancy
and frequently appear in nonpregnant women: 1
Peterson, Haines & Webster, Legal Medicine & Toxi-
cology, 930 et seq.; De Lee, Principles and Practice of
Obstetrics (3 ed.), Chap. 18; 2 Witthaus & Becker,
Medical Jurisprudence, Forensic Medicine & Toxi-
cology, 553 et seq.

The testimony for the prosecution is that prior
to December 18th the prosecutrix had recurring pains
in her uterus, which came with more and more fre-
quency until on the morning of that day, as she was
sitting upon a slop-bowl, there passed from her a
clot of blood about the size of an egg, in which, ac-
cording to the testimony of her sister and her brother,

there was a meaty substance about one and one-half inches long. No other description of the object is given. It was not produced at the trial and was not submitted to any medical man for examination. Bearing in mind that November 9th is the date of the only coition in the case, the delivery of the alleged fetus on December 18th means that at best pregnancy had advanced only thirty-nine days, or five weeks and four days. Dr. Landis testified to the effect that if there was anything in the uterus to clog it up, as a blood clot, or any condition to stop it up, if blocked up tight enough, it would present a condition that would usually bring on cramps about the same as labor pains, almost. Speaking of the size of the fetus at the end of the first month, he said:

"Well, the fetus would be almost an inch long at the end of a month. The arm buds and leg buds would be started by that time and they could absolutely be perceived at that time."

He declared that at the end of the second month the legs and arms would be well enough developed so that the finger-nails would be started, that this condition could be determined by the naked eye, and that the length of the embryo would be about one and one-half inches, all of which would be plainly visible.

According to De Lee's Principles and Practice of Obstetrics, page 55, at the end of the first month the embryo is two and one-half millimeters long, which is a little less than one inch. He says that buds representing extremities appear during the following week. "The visceral arches are distinct; the heart is a bulging, flexed tube lacking its characteristic chambers; the blind intestinal canal still opens rather broadly on the yolk sac; the first indication of the liver appears, but the kidney is undeveloped."

To the same effect is Gould's Dictionary of Medicine, under the title of Fetus. It is said in Stewart's Legal Medicine, at page 218, that:

"Other bodies are sometimes expelled which, while bearing some resemblance to the human embryo, are not always the products of conception."

It is said in 2 Wharton & Stilles Medical Jurisprudence, Section 100;

"In cases of difficult menstruation, there are sometimes expelled substances which by some persons might be mistaken for an early ovum. These are in some cases false membranes, occasionally discharged entire, preserving the shape of the uterine cavity; in others again, they are membranous concretions originating from coagula of the blood."

Such a condition is easily referable to a persistent clot of blood formed in the uterus of the woman after the operation she says was performed on November 22d, thirteen days after her single act of intercourse with the defendant. It may be, too, that the suppression of her menses on November 18th was a false alarm, rendering an operation wholly unnecessary even from a criminal standpoint. It is possible that this was what brought on the apparent labor of December 18th and resulted in what is described solely as a meaty substance about an inch and one-half long.

4. Neither as to size, consistency or physical appearance was the object expelled from the prosecutrix on December 18th described by any of the attributes which nature has given to a fetus of that age. Nothing is said about arm or leg buds or any of the contour of a fetus. In order to secure a conviction on the criminal charge embodied in the indictment, it was incumbent on the prosecution to exclude by

its proof.every reasonable hypothesis consistent with the innocence of the defendant by differentiating between a true fetus and such spurious uterine products as organized blood clots, polypi and the like.   Moreover there is applicable the presumption "that evidence willfully suppressed would be adverse to the party suppressing it if produced." Section 799, Or. L., subd. 5.   The substance taken from the slop-bowl and the scrapings of the woman's uterus alike could have been preserved and offered in evidence, but they were not.   The analysis of the testimony shows that whether or not the object expelled from the body of the prosecutrix was a fetus or something else not a fetus is reduced to a mere speculation.   The testimony, as a matter of law, does not exclude the reasonable hypothesis of its being something else than a child.   As said in *Spain* v. *Oregon-Washington R. & N. Co.,* 78 Or. 355 (153 Pac. 470, Ann. Cas. 1917E, 1104), by Mr. Justice McBRIDE,—

"When the evidence leaves the case in such a situation that the jury will be required to speculate and guess which of several possible causes occasioned the injury, that part of the case should be withdrawn from their consideration" Citing *Armstrong* v. *Town of Cosmopolis,* 32 Wash. 110, 72 Pac. 1038.

In *Ausmus* v. *People,* 47 Colo. 167 (107 Pac. 204, 19 Ann. Cas. 491), it is said:

"Certainly the death of the particular person charged in the information to have been murdered should be distinctly proved, either by direct evidence of the fact, by an inspection of the body and its complete identification, or by circumstantial evidence strong enough to leave no ground for reasonable doubt."

In *State* v. *Weston,* 102 Or. 102, 118 (201 Pac. 1083), together with other definitions of *corpus delicti,*

the following is quoted from note 4 to Section 325, 1 Wharton, Criminal Evidence, tenth edition, at page 635:

"The idea conveyed by the phrase, *corpus delicti,* is not obscure. While it is generally defined as the body of the crime, it is more clearly expressed by calling it the body or thing which is the victim of a wrong. The body of a man produced under circumstances that show a felony is *corpus delicti* in homicide, but the expression is equally correct applied to all crimes. The bodies of sheep or other domestic animals, with indications of poison feloniously administered, is *corpus delicti* in malicious mischief. A house partly burned, with evidences of incendiary firing, is *corpus delicti* in arson. The primary fact is the *corpus delicti.* When that appears in any crime, then follows the investigation which has for its object the detection and punishment of the criminal agency."

5, 6. It may be said that the *corpus delicti* is sufficiently established in homicide cases if by direct or circumstantial evidence it is shown that a human being has come to his death by criminal agency, irrespective of who committed the crime. This much for *corpus delicti* considered separately from the other elements of the charge against the defendant. In addition to this, the evidence must prove that he was the criminal agent who produced the death of the human being. Commenting upon this subject, in the case of *State* v. *Weston, supra,* Mr. Justice BROWN, writing the opinion, said:

"In this state direct evidence to establish either of these elements is not required, but where circumstantial evidence is relied upon it must be of the most cogent and convincing nature."

7. If an object is referred to in testimony as the body of a human being, although yet unborn, the evidence must describe it in terms applicable to a fetus as the laws of nature tell us such a thing exists at a given age, disclosed by the testimony. As a matter of law, if the state fails in this it falls short of the requisite proof to establish the *corpus delicti* to the extent of excluding every reasonable hypothesis consistent with the innocence of the defendant.

8. In brief, called upon to prove the death of a child, the testimony of the state fails to prove more than a situation, reasonably referable on behalf of the defendant to the discharge of a substance not a fetus, although there may be some testimony for the prosecution on other branches of the case. There is presented a condition in which the jury is left to speculation as to what the object really was. Conviction cannot be allowed to stand upon such an insecure foundation. There was a failure of proof as to the *corpus delicti.* The defendant's motion for a directed verdict of not guilty ought to have been allowed.

The judgment of the Circuit Court is reversed with directions to discharge the defendant.

REVERSED WITH DIRECTIONS.    REHEARING DENIED.

BELT, J., concurs in the result.