Argued April 14, affirmed June 2, 1955

# TUITE *v.* UNION PACIFIC STAGES ET AL.

284 P. 2d 333

566

568

*Ray G. Brown,* of Portland, argued the cause and filed briefs for appellant.

*L. A. Recken* argued the cause for respondent Russell.

*Randall B. Kester,* of Portland, argued the cause for respondents Finn and Union Pacific Stages.

Before WARNER, Chief Justice, and TOOZE, LUSK and BRAND, Justices.

TOOZE, J.

This is an action for damages for personal injuries alleged to have been caused by the negligent operation of motor vehicles, brought by Patricia A. Tuite, a minor, by her guardian ad litem, as plaintiff, against Union Pacific Stages, Incorporated, John B. Finn, and Curtis W. Russell, a minor, by his guardian ad litem, as defendants. A verdict was returned in favor of all defendants, and judgment was entered accordingly. Plaintiff appeals.

Defendant Union Pacific Stages, hereafter referred to as the "Stage company", is an Oregon corporation engaged in the operation of a public transportation system. At the time of the accident involved in this litigation, defendant John B. Finn was an employe of the Stage company, driving one of its motor buses.

Northeast Sandy boulevard, hereafter referred to as "Sandy", is a public street and thoroughfare located in Portland, Multnomah county, Oregon, and extends in a general northeasterly and southwesterly direction. It is a paved street 60 feet in width, and is divided into

two lanes for eastbound traffic and two lanes for westbound traffic, with additional space for parking at the curbs. Sandy is intersected at approximately right angles by another public street designated as N. E. 62nd avenue. Traffic at said intersection is controlled by electric traffic control signals. The indicated speed on Sandy at this point and for many blocks both easterly and westerly of the intersection was 30 miles per hour, and traffic lights at the intersections along Sandy were synchronized for a 30 mile per hour speed, so that motor vehicles proceeding at that rate of speed could continue traveling without interruption by stop signals.

Immediately prior to the accident defendant Finn was driving the Stage company bus containing one passenger in a westerly direction in the inside lane for westbound traffic on Sandy, next to the center line of the street. A trolley coach of the Portland Traction Co. was also proceeding in a westerly direction on Sandy in the outer lane, and as they approached N. E. 62nd avenue, the trolley coach stopped at the northeast corner of Sandy and N. E. 62nd avenue to pick up two women passengers, and while it was stopped the Stage company bus passed it on its left and entered the intersection.

Plaintiff was riding as a guest in an automobile being operated by defendant Curtis W. Russell. The Russell automobile was eastbound on Sandy and approaching N. E. 62nd avenue, and was traveling at a rate of speed variously estimated from 30 to 40 miles per hour. A car driven by one Spellman was traveling easterly on Sandy in the outside lane and had been passed by the Russell automobile immediately before the accident. Yet another car was proceeding easterly in the inside lane on Sandy ahead of the Russell automobile, and as the Stage company bus entered the intersection, this car was passing the bus on its left.

The accident occurred between 6:30 p.m. and 7 p.m., on November 13, 1951. It was a dark and cloudy night, had been raining, and was misting at the time; the pavement was wet and slippery.

Defendant Finn was proceeding at a rate of speed of approximately 25 miles per hour as he entered the city of Portland from the east, and by driving 25 miles per hour he was able to go through the three traffic signals east of the intersection at N. E. 62nd avenue without having to stop. As he approached and went through the intersection at N. E. 62nd avenue, he had the green (or go) traffic light in his favor. As Finn approached the intersection, he applied his brakes and reduced his speed to about 20 miles per hour. When the bus was beyond the center of the intersection, Finn observed the Russell car skidding broadside toward him, coming across the center line of Sandy to the north side thereof and into his lane of traffic. Finn then applied his brakes harder, but the wheels on the bus commenced to skid, so that the speed of the bus was reduced little.

Defendant Russell testified that when the bus was about three-fourths of the way across the intersection, a car traveling westerly came from behind or around the bus on the wrong side, and in order to avoid a headon collision with it, he applied the brakes on his car and went into a skid. It might be stated that no other witness saw this car. However that may be, the Russell car while in a skid collided with the left front corner of the bus, spun around in a complete circle, and then struck the Spellman automobile which was by then stopped at the south curb of Sandy.

There was considerable dispute between the parties as to the actual point of impact between the bus and the Russell car; and there was a dispute as to the speed of the Russell automobile at the time of the

impact. Spellman also testified that Russell appeared to be making a left turn at the intersection and that his car was not skidding. In any event, the Russell car, a fairly new Mercury, was practically demolished as a result of the accident, and plaintiff suffered severe and painful injuries.

In her complaint plaintiff charged the defendant Stage company with negligence in hiring and maintaining defendant Finn in its employ when it knew or should have known that said Finn was at all times a reckless, negligent, and incompetent servant, that he was habitually reckless in the operation of motor vehicles and had a propensity for reckless driving in violation of the traffic laws and was likely to cause injuries to others by his operation of a motor bus, and that said motor bus would become a dangerous instrumentality in his hands.

Plaintiff also charged the defendant Stage company and defendant Finn with negligence in the operation of said bus at the time and place in question in the following particulars:

"(a) In failing to maintain a proper or any lookout for other vehicular traffic then and there using said Sandy boulevard, and particularly for the automobile in which plaintiff was riding;

"(b) In failing and neglecting to keep said bus under proper or any control;

"(c) In failing and neglecting to reduce the speed of said bus, turn it to the right or left, or bring it to a stop, in order to avoid colliding with the automobile in which plaintiff was riding;

"(d) In failing and neglecting, after seeing plaintiff in a perilous position in said Mercury Sedan automobile, and that a collision was imminent, and having opportunity to realize and appreciate the danger of plaintiff, to reduce the speed of said bus, turn it to the right or left, or bring the

same to a stop in order to avoid colliding with said Mercury Sedan automobile.''

Plaintiff alleged that defendant Russell was guilty of gross negligence in the operation of his Mercury sedan automobile in the following particulars:

"(a) In operating said Mercury Sedan automobile at a highly dangerous, unlawful and excessive rate of speed under the circumstances then and there existing;

"(b) In failing and neglecting to keep said Mercury Sedan automobile under reasonable or proper control;

"(c) In driving and operating said Mercury Sedan automobile upon the north half of said North East Sandy Boulevard at a time when the same was being used by approaching traffic;

"(d) In suddenly applying his brakes so hard that he locked the wheels on said Mercury Sedan automobile at a time when the pavement was wet and slippery and without cause or reason so to do, causing said automobile to skid and cross to the north half of said North East Sandy Boulevard.''

By his answer defendant Russell admitted the negligence charged by plaintiff against his codefendants, but denied all allegations of negligence as to himself.

By his answer, defendant Finn admitted the negligence charged by plaintiff against his codefendant Russell, but denied all allegations of negligence as to himself. The defendant Stage company filed a plea in abatement as to the charges of negligence made against it with respect to the employment of the defendant Finn, and by answer admitted the negligence charged by plaintiff against defendant Russell, but denied all negligence alleged against Finn and itself.

It is unnecessary to set forth the grounds for the plea in abatement inasmuch as no action was directly taken thereon by the court. However, the court did

take the allegations of the complaint respecting the alleged antecedent negligence of the defendant Stage company from consideration by the jury, on the ground that it had no application to the facts in this case. This action by the court forms the basis of plaintiff's first assignment of error on this appeal.

Plaintiff's first point under this assignment of error is that "an injured party in an automobile accident case may pursue the entrustment doctrine along with that of respondeat superior in the same action." The following authorities are cited to support that contention:

*Halsan v. Johnson,* 155 Or 583, 65 P2d 661;

*Brown v. Fields,* 160 Or 23, 83 P2d 144;

*Guedon v. Rooney,* 160 Or 621, 87 P2d 209, 120 ALR 1298;

Oregon Briefs, Vol 1139, for 1938;

§ 1-911, OCLA;

*Krausnick v. Haegg Roofing Co.,* 236 Iowa 985, 20 NW2d 432, 163 ALR 1413;

*Elliott v. Harding,* (1923) 107 Ohio St 501, 140 NE 338, 36 ALR 1128;

Annotations, 135 ALR 481 and 112 ALR 416;

Restatement, Torts, vol 11, § 390.

■ Where in a given case it is a question of fact or law to be determined whether one operating an automobile owned by another is the agent or servant of such other and engaged upon the business of his principal or master, and within the scope of his employment, or whether he is mere bailee operating the vehicle for his own purposes with the permission of the owner, it is, of course, proper to plead the so-called "entrustment doctrine" along with that of respondeat superior in the same complaint. However, the two theories should be separately pleaded.

In *Guedon v. Rooney,* supra, defendant Rooney was the owner and defendant Wilson the driver of the car

involved in the accident. In the same cause of action plaintiff charged Rooney with negligence in entrusting the car to Wilson, whom he knew or should have known was a reckless, incompetent, careless, and unsafe driver, addicted to the excessive use of intoxicating liquors, and frequently driving while under the influence thereof, and also charged both defendants with specific acts of negligence, the defendant Rooney under the theory of respondeat superior, having alleged that Wilson was his agent and employe.

After calling attention to the different theories stated in plaintiff's complaint, Mr. Justice BAILEY, speaking for the court, said:

"The three theories stated in the complaint on which plaintiff sought recovery against the defendant Rooney were not set forth as separate causes of action, but were joined as one cause of action. No motion, however, was made by the defendant against this manner of pleading, nor is it contended that it was not proper to state the plaintiff's basis of recovery on alternative grounds.

"*The defendant Rooney did not admit in his answer nor does he now admit, that Wilson was in his employ at the time of the accident.* He contended in the trial court, and now argues on this appeal, that Wilson was an independent contractor. The defendant Wilson, on the other hand, admitted in his answer that he was at the time of the accident driving the defendant Rooney's automobile as the agent and employee of Rooney, and was at that time 'acting in the business of the owner in the course and within the scope of his employment and in the furthering of the business of said defendant, P. J. Rooney, as his agent and employe.'

"The general rule that the owner of an automobile is not liable for the negligence of one to whom the automobile is loaned has no application in cases of the owner's lending an automobile to another with knowledge that the latter is an incompetent,

reckless or careless driver and is likely to cause injury to others in the operation of the motor vehicle. In such cases, the owner is held liable for injuries caused by the borrower's negligence, *on the ground of the owner's negligence in entrusting the automobile to a person who, he knows, is apt to cause injury to another in its use*: 4 Berry on Automobiles, 7th Ed., § 4.406; Rocca v. Steinmetz, 61 Cal. App. 102, 214 P. 257; Priestly v. Skourup, 142 Kans. 127, 45 P. (2d) 852, 100 A.L.R. 916; Mitchell v. Churches, 119 Wash. 547, 206 P. 6, 36 A.L.R. 1132; Levy v. McMullen, 169 Miss. 659, 152 So. 899; Crowell v. Duncan, 145 Va. 489, 134 S.E. 576, 50 A.L.R. 1425; Elliott v. Harding, 107 Ohio St. 501, 140 N.E. 338, 36 A.L.R. 1128.'' (Italics ours.)

■ In the instant case, no question whatever is raised as to the status of defendant Finn at the time of the accident. It is admitted that he was an employe of the defendant Stage company and was driving the motor bus as agent and employe of and on behalf of the Stage company, and within the scope of his employment. If he was guilty of negligence in the operation of the bus as charged, then not only he was liable for such negligence, but also the bus company, under the doctrine of respondeat superior. If Finn was not guilty of negligence as charged at the time and place in question, then the defendant Stage company could not be held liable in damages no matter how careless, incompetent, or reckless a driver he may have been at other times and places. The ''entrustment doctrine'' had no application whatever to the facts and circumstances of this case, and the trial court properly took it from consideration by the jury. It would have erred had it not done so. It is unnecessary to discuss the two additional points stated under the first assignment of error, which refer to evidentiary matters.

■ By statute in some states, an owner of a motor vehicle who has consented to its operation by another

person is made liable for injury or damage resulting from its negligent operation by such other, without regard to whether or not the relationship of master and servant or principal and agent exists between the owner and the operator of the car. Insofar as liability of an owner of a car for the negligent operation thereof by another is concerned, it is in those states and under those statutes that the "entrustment doctrine" is most frequently applied. See Note, 135 ALR 481. We have no such statute in this state, and here the doctrine comes into play only when the relationship of master and servant or principal and agent between the owner and operator of the vehicle does not exist, or when it does exist, the operator of the vehicle is not engaged at the time upon the business of the master or principal, but is serving his own purposes.

■ The trial court took from the jury's consideration specifications (b) and (c) of the specific acts of negligence charged against defendants Stage company and Finn as above set forth. It did so upon the theory that both those allegations were covered by the specification of negligence charged in (d), and to submit specifically the allegations of (b) and (c) would be repetitious. It is manifest that the allegations contained in specification (d) relate entirely to the last clear chance doctrine; the allegations therein are entirely separate and distinct from the allegations contained in specifications (b) and (c). Specification (b) has to do with the matter of control of the bus. In addition to the duty of control as related to speed under the basic rule, there is also the common-law duty of control. *Prauss v. Adamski,* 195 Or 1, 19, 244 P2d 598. Specification (c) related entirely to the basic rule, which deals exclusively with the rate of speed at which a motor vehicle shall be operated. § 115-320, OCLA, as amended by ch 458, Oregon Laws 1941 (ORS

483.102 to 483.112). Although the trial court may have erred as to the reasons assigned for taking the specifications of negligence in question from the jury, nevertheless, in our opinion the result was proper.

■■ We are unable to find anything in the record of a substantial nature to support a contention that the defendant Finn did not have the bus under proper control; that is, under such control as would be maintained by a reasonably prudent bus driver in like or similar circumstances. He certainly was not required to anticipate that any car he might meet along the highway would suddenly skid across the road in front of him, and to have the bus under such control as to be able to stop almost instantly. If such were the case, he would get nowhere. The street ahead of him was clear of traffic in the lane in which he was traveling, and a rate of speed of 20 to 25 miles per hour was well within the indicated speed for that section of the city. In fact, the traffic signs indicating the speed along Sandy and the synchronization of the several traffic signals at the intersections for uninterrupted travel at that rate of speed invited the defendant Finn to travel at the rate of 30 miles per hour. When the Russell car suddenly skidded into Finn's lane of traffic, it obviously took some time for his reaction and the setting of the brakes on the bus. When the bus started to skid after the application of the brakes, he put no more pressure on the brakes. He not only had his own passenger, to whom he owed the highest degree of care, to consider, but also all other traffic on the street. For these reasons, the trial court was not in error in removing specification (b) from consideration by the jury.

■ What we have said with respect to the matter of control applies with equal if not greater force to specification (c). Under the facts and circumstances of this case, and as to defendants Stage company and Finn,

there was no jury question as to the violation of any part of the basic rule. As to the operation of the bus, the element of speed was not involved, and, as before observed, the provisions of the basic rule relate exclusively to the matter of speed. However, the evidence discloses that Finn did reduce the speed of the bus, applying the brakes until it started to skid; it is manifest that he did all that any reasonably prudent bus driver could have done to bring it to a stop without permitting it to get completely out of control by going into a full skid. Finn did not create the emergency through any act of his own; he was traveling in a proper lane of traffic at a reasonable rate of speed; the emergency was created by the skidding car in which plaintiff was riding, a car skidding across the center line of the street directly into the bus' line of travel.

With equal propriety, the court might well have taken specification (a) relating to lookout from the jury. There is no substantial evidence in the record that Finn did not maintain a proper and efficient lookout. He not only observed the Russell car before and at the time it went into a skid, but also took note of the other traffic at, in, and near the intersection.

Also, under all the facts and circumstances of this case, it is very doubtful that there was any substantial evidence to justify the submission of the doctrine of last clear chance to the jury, as alleged in specification (d). However, the question of the propriety of submitting specifications (a) and (d) is not before us on this appeal. We were induced to mention the matter because of plaintiff's numerous assertions in her brief that she did not obtain a fair trial at the hands of the able and conscientious trial judge. In our opinion, she was given advantage of much more than she was justly entitled to under the evidence.

Plaintiff's fourth assignment of error relates to

the withdrawal by the court from the jury's consideration of the question of the alleged permanent nature of plaintiff's injuries. We need not discuss that assignment of error because the verdict in favor of defendants upon the question of liability renders the question of damages and related subjects moot. *Tycer v. Hartsell,* 184 Or 310, 198 P2d 263.

On the trial of the case plaintiff called one Wells, a civil engineer, as an expert witness to testify respecting the distance it would take to bring a bus such as the one involved in this case to a stop, a bus weighing 12½ tons. The witness testified that he had been studying, from an engineering standpoint, the stopping distances of motor vehicles for about 20 years and had testified as an expert witness upon the subject in other cases in Multnomah county. Before objection was made to any part of his testimony, the following proceedings were had:

"Q Now is there in engineering a formula known as the 'coefficient of friction'?

"A Well, the coefficient of friction is not a formula, but it's part of a formula.

"Q All right. Can you tell the jury and Court about that? What is meant by it in plain language?

"A Well, I can try. The formula is V squared over 30 times F, where 'V' is the velocity of the vehicle in miles per hour and is divided by the figure 30 times the letter 'F', which represents the coefficient of friction; and this coefficient of friction is built up from actual tests on various kinds of pavements, and it runs all the way from point six to three point nine five, depending on the type of pavement.

"Q I didn't mean to interrupt you. What does the expression 'coefficient of friction' mean?

"A Well, it's the ratio between the weight of the vehicle and the speed and the condition of the pavement.
"*  *  *  *  *

"Q When did you first become interested and when were you first called upon—I should ask—to do that, how long ago?

"A Well, I don't remember exactly, but it was 18, 20 years ago.

"Q Now at my request, have you made a calculation under the formula you have described, to determine the distance within which a motor bus equipped with four-wheel brakes, assuming the driver had his foot on the brake, could stop that bus on wet pavement, such as there is at Sandy Boulevard and 62nd, when the bus is proceeding at 20 miles an hour?

"A I did, yes.

"Q What is the result of your calculations?"

Defendants' objection to the profferred testimony was sustained, and plaintiff made an offer of proof, which was rejected. Plaintiff contends that the court erred in not admitting this evidence.

Wells did not claim to have any personal knowledge or experience with regard to the stopping distances of motor vehicles, nor did he ever operate a motor bus. His opinion was based solely upon a formula which appeared in a traffic engineer's handbook which he testified was compiled from general averages of tests of different types of vehicles, equipment, and drivers. The handbook was not produced in court. In commenting upon the offered testimony, the trial judge remarked:

"May I further comment that Mr. Wells is in no better position to express an opinion than you or anyone who possessed the ability to read. It would be like calling a person who had read a medical book and put them on the stand and have them testify, where they possess no special training or no special experience * * *."

■ We agree with the trial court. It is manifest that had the handbook upon which the witness based his

opinion been offered in evidence, it would have been rejected. *Kern v. Pullen*, 138 Or 222, 227, 6 P2d 224, 82 ALR 434. The handbook itself being inadmissible, it follows that its contents do not become competent evidence simply because they are related or read by a witness. As to the contents of the handbook and the formula therein set forth, they constituted pure hearsay insofar as the witness was concerned. With but few exceptions which it is unnecessary to discuss here, an opinion cannot be based upon hearsay; it must be based upon facts which are in evidence. 1 Belli, Modern Trials 378, § 59 (4).

In *Henderson v. U.P.R.R. Co.*, 189 Or 145, 167, 219 P2d 170, Mr. Justice Lusk, speaking for the court, said:

> "It is the rule in this state, as elsewhere, that 'an expert, though thoroughly qualified as a witness, cannot be permitted to give an opinion upon facts known to him, and not communicated to the jury'; that 'no allegation can be proved by the *ipse dixit* opinion of any expert *unless the facts or phenomena upon which he bases his opinion are disclosed either by his own testimony or that of other witnesses*.' State v. Willson, 116 Or. 615, 619, 620, 241 P. 843; State v. Simonis, 39 Or. 111, 116, 65 P. 595. See, also, Lippold v. Kidd, 126 Or. 160, 164, 269 P. 210, 59 A.L.R. 875; Rogers, op. cit., 106, § 52; Wigmore, op. cit., 792-3, § 672, 799, § 680. In Lippold v. Kidd we said:
>
> " 'The expert witness is granted the privilege of expressing to the jury an opinion because his superior training enables him to arrive at a conclusion which is more likely to be sound than that of the average juror. But all opinions are based upon facts; generally the recipient of an opinion is at a loss to know what use he may advisedly make of an expert's opinion unless he also knows what facts the expert took for granted when he formulated his conclusion.' " (Second italics ours.)

The formula relied upon by the witness was one produced from general averages of tests of different types of motor vehicles, equipment, and drivers. Aside from the mathematical relationships within the formula, its basic assumption is the "coefficient of friction" which, according to the witness, is supposed to be the ratio between the weight of the vehicle and its speed and the condition of the pavement. In order to apply the formula, it is necessary to assign a mathematical value to the character of the surface of the road. The witness admitted that he had no personal knowledge of the character of the pavement surface at Sandy and N.E. 62nd avenue. Moreover, the formula gives no consideration to a driver's reaction time; it makes no allowance for brake lag or the degree of severity with which brakes are applied, nor does it take into account the amount of tire surface and the condition and type of tire tread or the degree of wetness or slippery condition of the pavement.

It is evident, therefore, that since the factors in the formula representing the coefficient of friction are necessarily indefinite, particularly because of varying types and conditions of roadway surface, the results produced by the application thereof must necessarily be more or less speculative in any individual case. In each case the specific circumstances and conditions existing at the time and place of the accident are controlling, and it is in the light of those circumstances and conditions that an opinion may be expressed by one qualified to express an opinion, if the situation be one warranting the admission of expert testimony, and not in the light of general averages obtained by experiments conducted at other times and in other places.

It is firmly established in this state that the propriety of admitting opinion evidence and determin-

ing the qualifications of expert witnesses rest largely in the discretion of the trial court, and its determination of either question will not be disturbed on appeal unless there has been a manifest abuse of discretion. *Timber Structures v. C.W.S.G. Wks.*, 191 Or 231, 242, 229 P2d 623, 25 ALR2d 1358; *Shaver v. Eagle Star Ins. Co.*, 177 Or 410, 417, 162 P2d 789. We find no abuse of discretion on the part of the trial court in rejecting the proffered testimony.

The sixth assignment of error is directed to the action of the trial court in rejecting the testimony of one Harold G. Koon, called as a witness by plaintiff to testify respecting an experiment conducted by him at the intersection of Sandy and N. E. 62nd avenue, and its results. The witness testified in part as follows:

"Q  What line of work have you followed, Mr. Koon?

"A  Streetcar work and bus driving.

"Q  By whom are you presently employed?

"A  Portland Traction Company.

"Q  When did you first go to work for Portland Traction Company?

"A  1915.

"Q  What was your job then if you recall?

"A  I was a conductor on the streetcar.

"Q  Later did you start driving motor busses?

"A  Yes, eleven years later, 1926.

"Q  Have you also operated busses that take their power from the trolley on the wire?

"A  Yes.

"Q  What do you call those, trolley busses?

"A  Trolley coaches.

"Q  How many years do you think that you have driven busses altogether?

"A  Since 1926. That's twenty-six years.

"* * * * *

"Q Now are you acquainted with the location of 62nd Avenue and Sandy Boulevard, Mr. Koon?

"A Yes.

"Q At my request have you taken a bus to that location and conducted a stopping test?

"A I did.

"Q When did you do that, Mr. Koon?

"A Saturday, the 6th.

"Q Of December, 1952?

"A That's right.

"Q Now will you, before going further, will you tell the Court and jury what kind of a bus you took and used to conduct that test?

"A I took a diesel bus weighing approximately —exactly 19,900 pounds without the fuel. What it would weigh with it, I don't know—35 feet long. They have dual tires in the rear. The tires are 11 by 22 inches.

"Q And how was your braking power on that bus?

"A Normal.

"Q Mechanical?

"A Air.

"Q It was air brakes. Now you speak of dual equipment. You mean on the rear of the bus you have two tires on each wheel?

"A That's right.

"Q And in the front of the bus how is it?

"A Same size tire, but just one on each side.

"Q Now what was the weather like at the time you conducted this stopping test?

"A It was raining.

"Q Were the streets wet?

"A Yes, indeed, they were.

"Q Now go ahead and tell the Court and jury about the test you made and the result of the test.

"[Interruption by counsel.]

"A I approached the—

"Q First I should ask you, did you have one or more passengers on the bus?

"A One.

"Q I am sorry. Go ahead.

"A I approached the intersection of 62nd and Sandy westbound on the outside lane at 25 miles an hour, and perhaps when I was within 40 or 50 feet of the near side property line, I checked my speed to 20 miles an hour and left my foot resting on the brake, and as my bus entered the intersection and just crossed on the intersection, I would say about —very close to the center of the intersection, I applied my brakes, not completely, not—you might say I didn't dynamite my brakes; I checked my bus down as far as I could so that anyone, if there had been any passengers on the bus, would not have been injured.

"MR. KESTER: Just a moment. This 'if' business·is speculative. We move to strike that part.

"THE WITNESS: I stopped my bus—

"THE COURT: Just a moment. The motion will be allowed. It may be stricken.

"THE WITNESS: —from a point approximately in the middle of the intersection, 16 or 17 feet short of the pedestrian crossing on the far side or west side of 62nd. I applied my brake and stopped as quickly as I could, just short of dynamiting my brakes.

"MR. BROWN: Now I will ask, your Honor, I will ask what we might call the '$64 question' for the result of the test, so that if counsel wishes to object before the question.

"* * * * * [Objection made and overruled.]

"Q (by Mr. Brown) Now then, Mr. Koon, you might have forgotten the question I asked, but you go ahead and tell the jury within how many feet it took you to bring that bus to a stop under the conditions you have just described.

"A You want the distance from the time, at 20 miles an hour with my foot resting on the brake, I decided then to stop?

"Q  That's right, Mr. Koon.

"A  Approximately 27 feet.

"*   *   *   *   *

"Q  (by Mr. Brown)  Mr. Koon, you said, I believe, that you did not what you call 'dynamite' your brakes. Will you tell the jury what is meant by that expression among drivers?

"A  Put your brake right to the floor and leave it there.

"Q  How does such a stopping procedure compare with what we normally refer to as an emergency stop?

"A  An emergency stop is more or less the test stop I made."

On cross-examination the witness further testified as follows:

"Q  In other words, your passenger was not the type of paying passenger which the bus company would normally carry?

"A  No, no.

"Q  In other words, he wasn't someone to whom you owed the duty of a passenger carried like your other paying passengers would be?

"A  That's right.

"Q  How did you happen to make this test, Mr. Koon?

"A  Our bus was chartered by Mr. Brown from the Portland Traction Company, and they sent me out to make the test.

"Q  When did all this happen, day before yesterday?

"A  Day before yesterday, Saturday afternoon, yes, sir.

"*   *   *   *   *

"Q  And you had a conversation with Mr. Brown, did you, before going out there?

"A  Yes.

"Q And Mr. Brown at that time explained to you what he wanted in the way of an experiment and the result that he wanted to illustrate, did he?

"A Well, he explained what he wanted. I don't know about the results he expected to get. I don't remember.

"Q Didn't he tell you what results he thought you would reach?

"A No, he didn't.

"Q Before going out there, didn't you discuss with him what you each thought ought to be required in the way of bus stop in distance?

"A Well, I—frankly, I couldn't answer that question at the time, because I didn't know. I had never made a stop like that to measure it.

"Q You never made that kind of a test?

"A No. I could make a detonator test, where you do dynamite your bus. I could tell you the figures on that, but this wasn't that kind of a test.

"\* \* \* \* \*

"Q But that's not the kind of test you made here the other day?

"A No.

"Q When you went out there the other day, Mr. Brown had already explained to you what this lawsuit was about, had he not?

"A Partially, yes.

"Q And he had told you some of the different testimony that had been given, in the testimony about where the vehicles were, and where the point of impact was, and where the vehicles came to a stop—he had already discussed that with you, had he not?

"A I don't believe he told me the point of impact.

"Q But he did tell you some of the other things about where the vehicles were?

"A That's right.

"Q When the brakes were supposed to be applied, and so on?

"A Yes.

"Q So when you went out there, you already had instructions that you were to apply to brakes at a certain point on the pavement, did you not?

"A As near as I could, yes.

"Q And you were planning ahead to put your brakes on just when the bus hit that particular point, were you not?

"A As near as I could, that's right.

"Q So you were not faced with any emergency situation requiring you to react on your own initiative, were you?

"A That's right."

Although the results of the test were admitted in evidence over objection of defendants, nevertheless, upon conclusion of all the testimony of the witness, the trial court sustained defendants' motion to strike the same and instructed the jury to disregard it.

Evidence of experiments performed out of court, when they are made under similar and like circumstances to those existing in the case at issue are generally admissible for the purpose of proving facts in issue. Indeed, it is often that such experiments may afford evidence more satisfactory or reliable than oral testimony. Yet before the results of any such experiment may be introduced in evidence, it is necessary to prove that the experiment was made under conditions and circumstances similar to those prevailing at the time and place of the occurrence involved in the controversy. It is not necessary that the conditions and circumstances under which the experiment was made shall be identical with those existing at the time and place of the occurrence in controversy, but it is necessary that there be a substantial similarity. If the requirement of substantial similarity is not satisfied, the

experimental evidence will not be admitted. *Ragan v. MacGill*, 134 Or 408, 292 P 1094, 72 ALR 860; *Hall v. Brown*, 102 Or 389, 202 P 719; 20 Am Jur 627, Evidence, § 756; 2 Belli, Modern Trials 1023, § 180. The measure of permissible variation of the conditions of the experiment from those of the occurrence is measured by whether such variation is liable to confuse or mislead the jury. 20 Am Jur 630, § 756.

■ However, the admission of evidence of experiments is a matter peculiarly within the discretion of the trial judge, and this discretion will not be interfered with on appeal unless it is made apparent that it has been abused. In *Hall v. Brown*, supra, at page 395, we quoted the following from *Leonard v. Southern Pacific Co.*, 21 Or 555, 28 P 887, 15 LRA 221:

> "Experiments and demonstrations used in evidence should be made under conditions similar to those attending the fact to be illustrated; and when this rule is observed, the discretion of the trial court in allowing the result of such experiments to go to the jury will not be reviewed in the absence of abuse thereof."

and then said:

> "The principle is, that at best it is within the discretion of the court to admit any testimony whatever about experiments or similar occurrences. But in any event, the conditions must appear to be substantially the same. It is not within the discretion of the court to admit evidence about experiments, unless the conditions are substantially alike."

15. Undoubtedly a party has a right to present evidence of similarity of conditions attending the experiment with those attending at the time and place of the accident, as the basis of presenting evidence as to the results of such experiment. The exercise of this right is

not a matter of judicial discretion. In 2 Belli, Modern Trials 1023, § 180, this rule is stated as follows:

"While generally the reception of experiment evidence is within the trial judicial discretion, nevertheless, this should not be confused with evidence of similarity of conditions attending the experiment and the accident. The offer of such evidence is a matter of right, not discretion."

■ But the determination of the question whether such evidence as to similarity of conditions is sufficient to warrant the admission of the evidence as to the results of the experiment must necessarily remain a matter of judicial discretion, which determination will never be disturbed on appeal unless it is manifest that there has been an abuse of discretion.

In the instant case the trial court struck the testimony of the witness from the record upon its final determination that substantial similarity between the conditions attending the accident and those attending the experiment had not been sufficiently established, and that the offered evidence might tend to confuse or mislead the jury.

■ From the record we are unable to say that the trial court abused its discretion. There were several important differences between conditions attending the experiment and those attending at the time and place of the accident. In defendants' brief some of the physical differences are pointed out as follows:

"(1) The experiment was made more than a year after the accident. The only evidence that the pavement surface was the same was by the witness Irwin, who said that the pavement was 'just about the same', but he admitted that he had not made a careful observation of it to see that it was the same, and he didn't pay any particular attention.

"(2) The accident happened at night, when it

was dark while the experiment was conducted in the daytime.

"(3) The bus of the Portland Traction Company used in the experiment was not shown to be of the same type or make as that of defendant U.P. Stages. The traction company bus was obviously designed for city traffic, while the U.P. bus was intended for over-the-road hauls.

"(4) The bus used in the experiment weighed less than ten tons while that of defendant weighed 12½ tons.

"(5) It was not shown that the braking systems of the two busses were identical. All air brakes do not work exactly alike.

"(6) There was no showing that the two busses had the same amount of tire surface in contact with the street, or the same condition of tread on the tires. There are different sizes and kinds of dual tires.

"(7) While it was raining on both occasions, there is no way to reproduce the same amount of rain, or the same degree of wetness [or slippery conditions] of the street.

"(8) There was no way that the amount of pressure on the brake pedal used by the driver Finn could be reproduced by the experimenter, Koon.

"(9) There was no other traffic to concern Koon, while Finn had several other vehicles in the vicinity besides his own.

"(10) The passenger in the experimenting bus was not a regular paying passenger to whom its driver owed the highest degree of care."

Furthermore, as so aptly stated in defendants' brief:

"More important than the physical differences, however, was the difference in the *mental attitude* of the two bus drivers. Whereas Finn was confronted with a sudden emergency requiring instant

action in the face of impending peril, Koon was coolly executing according to plan a wholly artificial maneuver. Koon knew exactly where in the intersection he was supposed to apply his brakes, and he did apply them at that point, so that he completely eliminated his own reaction time. Finn however had to observe the peril, decide what to do, and react so as to do it. * * *.

"Furthermore, Finn had to weigh alternative courses in deciding whether or not to dynamite his brakes and whether to swerve or stay in his own lane. He had to consider the welfare of his own passenger, the possibility of sideswiping the trolley coach * * *, and the possibility of colliding with the Spellman car or the one ahead of it. Koon had no such problems, but at all times knew exactly what he was going to do."

Plaintiff's remaining assignments of error, numbered VII to XII, inclusive, are directed to certain instructions given the jury. Because of the fact that under the issues formed by the pleadings in this case the standard of care to be exercised by all the defendants was not the same, the defendants Stage company and Finn being charged and liable for ordinary negligence only, while defendant Russell was charged with and liable only for gross negligence under our Guest Statute (§ 115-1001, OCLA; ORS 30.110), properly instructing the jury was a difficult task. The instructions of the court must be considered as a whole. We have carefully examined all of the instructions given, including those challenged by the plaintiff, and we find no prejudicial or reversible error in any of them.

In one instruction complained of by plaintiff the court told the jury that the negligence of Russell, if any, could not be imputed to his guest, the plaintiff, and that such negligence on the part of Russell of itself would not bar plaintiff's right of recovery.

■ No contributory negligence was charged against plaintiff in any of the answers of the several defendants; for that reason the instruction was unnecessary and abstract, but it could hardly be deemed prejudicial to plaintiff. On the contrary, it more likely was of benefit to plaintiff.

However, one of the instructions given to the jury, and to the giving of which plaintiff excepted, is erroneous. The court, after properly instructing as to the "sudden emergency" rule as it applied to defendant Finn, instructed the jury as follows:

"You are likewise instructed that in determining whether or not the defendant Russell was grossly negligent you will take into consideration all of the facts and circumstances disclosed by the evidence, and if you find from a preponderance of the evidence in this case that through no *gross negligence* on his part the defendant Russell found himself confronted by an emergency which constituted an imminent and impending danger due to the unexpected appearance of an automobile in the intersection, passing to the south of the bus of the defendant, Union Pacific Stages and occupying the northerly portion of that part of Sandy Boulevard provided for eastbound traffic, the fact, if it be a fact, that in attempting to escape such imminent danger the defendant Russell turned to his left upon the wrong side of the highway or suddenly applied his brakes, skiding to the left and into that portion of Sandy Boulevard provided for westbound traffic, or made a mistake in judgment, would not make defendant Russell guilty of gross negligence unless the actions of defendant Russell at such time and place were not those of an ordinarily careful and prudent person so faced by a like emergency. If the emergency was due to the *gross negligence* of the defendant Russell then the defendant Russell is not entitled to the benefit of the rule just called to your attention." (Italics ours.)

Plaintiff took the following exception to that instruction:

"No. 3. Instruction on emergency as applicable to each and all of the defendants, on the ground that there is no claim in the answers—in other words, *it wasn't pleaded.* Under the Werline case we feel that is a matter that should be raised in the pleadings in order to have an issue of it." (Italics ours.)

■ The only contention made by plaintiff as to said instruction was that it should not have been given because an emergency had not been pleaded by any of the defendants in their several answers. No attack was made upon the correctness of the instruction itself, either in the trial court or here. Plaintiff contends that the issue of emergency should be made in the pleadings and cites *Sherrard v. Werline,* 162 Or 135, 91 P2d 344, in support of her claim. There is nothing in the Werline case to support this contention. Whenever the facts in any given case are sufficient to justify an instruction upon the emergency rule in favor of either party, the instruction should be given, if requested. The propriety of giving such an instruction depends solely upon the facts, not upon the pleadings. In some cases it may be proper to plead an emergency in explanation of or as an excuse for alleged negligence, but it is not necessary as a condition of receiving the benefit of the rule if the evidence on the trial shows its application. Ordinarily, when an emergency is pleaded, it is in anticipation of a defense. Such was the situation in the Werline case. Though under the circumstances of that case we approved the pleading, nevertheless, we in no way indicated that such pleading was necessary.

■ The emergency rule is well established in this state and has been stated by this court in many decisions. For examples see *Stose v. Heinrich and Horseny,* 199 Or 386, 388, 261 P2d 675; *Prauss v. Adamski,*

supra; *Noble v. Sears*, 122 Or 162, 257 P 809. We have repeatedly held that as a condition for the application of the rule the party claiming its benefits must himself have been without fault or negligence on his part. In *Schutt v. Hull*, 193 Or 18, 23, 236 P2d 937, we said:

"It is the law that a person cannot invoke the emergency doctrine if the emergency is created by his own negligence."

■ In the instruction above quoted the court told the jury that the defendant Russell was entitled to the benefit of the emergency rule if through no "gross negligence" on his part he was confronted by an emergency of imminent and impending danger. It was error so to instruct. If Russell, through ordinary negligence or fault on his part, was confronted with the emergency, he was not entitled to the benefit of the rule. As to the emergency rule and its application, the fact that plaintiff was under obligation to prove gross negligence on the part of Russell in order to recover from him had no bearing whatever. But plaintiff took exception not at all to the instruction upon the grounds just discussed; therefore, that error is not before us on this appeal. It is error, but not reversible error.

In *Stose v. Heinrich and Horseny*, supra, at page 390, we stated:

"It is well established in this state that an exception must be timely made and must bring to the attention of the trial court all of the grounds upon which it is based, before it may be considered by this court. Where the objection urged to the instruction was not presented to the trial court, it cannot be considered here for the first time. Whitehead v. Montgomery Ward & Co., Inc., 194 Or 106, 128, 239 P2d 226; Suko v. Northwestern Ice Co., 166 Or 557, 573, 113 P2d 209."

Finding no prejudicial or reversible error in the record, we affirm the judgment.