Lane LEONARD,
in his capacity as personal representative of
the Estate of Lindsay Alyse Leonard,
*Plaintiff-Appellant,*

*v.*

MORAN FOODS, INC.,
dba Save-A-Lot Food Stores;
Supervalu, Inc.,
dba Save-A-Lot Food Stores;
Tito Jose Feliciano,
and City of Portland,
*Defendants-Respondents,*

*and*

PORTLAND GENERAL ELECTRIC COMPANY,
dba PGE,
*Defendant.*

Multnomah County Circuit Court
100811857; A150101

343 P3d 693

Richard J. Vangelisti argued the cause for appellant. With him on the opening brief were Scott F. Kocher, Vangelisti Kocher LLP, Meagan A. Flynn, and Preston Bunnell & Flynn, LLP. With him on the reply brief were Vangelisti Law Firm LLC, Meagan A. Flynn, and Preston Bunnell & Flynn, LLP.

Jan K. Kitchel argued the cause for respondents Moran Foods, Inc., Supervalu, Inc., and Tito Jose Feliciano. With him on the briefs were W. Michael Gillette, Andrew J. Lee, and Schwabe, Williamson & Wyatt, P.C.

Harry Auerbach, Chief Deputy City Attorney, argued the cause and filed the brief for respondent City of Portland.

Before Duncan, Presiding Judge, and Lagesen, Judge, and Schuman, Senior Judge.*

LAGESEN, J.

---

* Lagesen, J., *vice* Wollheim, S. J.

## LAGESEN, J.

While driving as part of his job as a district manager for defendant Moran Foods on the night of November 1, 2009, defendant Tito Feliciano struck plaintiff's daughter, Lindsay Leonard, with his car as she was crossing Foster Road in Portland in a marked but faded crosswalk under a streetlight that was not working. The collision killed Leonard. Plaintiff, Leonard's father, filed this wrongful death negligence action against a group of defendants whose conduct, he alleges, converged to cause Leonard's death: Feliciano (for his negligent acts as a driver); Moran Foods, Inc. (for its vicarious liability as Feliciano's employer and for its own negligence in failing to provide adequate training to Feliciano on the company's cell phone use policy and on safe driving); Moran Foods' parent company, Supervalu, Inc. (for failing to provide adequate training to Feliciano on its cell phone use policy); the City of Portland (the city) (for negligent maintenance of the crosswalk markings); and Portland General Electric Company (PGE) (for negligent maintenance of the streetlight).

The case went to trial against Feliciano and Moran Foods only. The trial court dismissed Supervalu and the city from the case on summary judgment, concluding that there was no evidence from which a reasonable factfinder could find that those parties' conduct, even if negligent, played a causal role in the accident; the court dismissed PGE from the case after plaintiff settled with PGE. The trial court also did not permit plaintiff to present to the jury his theory that Moran Foods' alleged negligence in training Feliciano on the company's cell phone use policy contributed to the accident, having granted summary judgment to Moran Foods on that theory. The jury ultimately returned a verdict finding Leonard 51 percent at fault, Feliciano 34 percent at fault, and Moran Foods 15 percent at fault. As required by ORS 31.600,[1] the trial court entered judgment in favor of defendants.

On appeal, the primary question confronting us is this: should plaintiff have been permitted to make his case against Supervalu and the city to the jury? That is, at

---

[1] ORS 31.600(1) requires that a person seeking to recover damages for an injury or death not be more than 50 percent at fault for the injury or death.

summary judgment, did plaintiff come forward with evidence that would permit a reasonable factfinder to find either that Supervalu's failure to train Feliciano adequately on its cell phone use policy, or the city's failure to maintain the crosswalk markings, was a substantial factor in Leonard's death?

We answer that question in the negative with respect to Supervalu, but conclude otherwise with respect to the city and, accordingly, reverse and remand for a new trial. We also address the other issues raised by the parties that may bear on the trial court's conduct of the trial on remand: (1) Whether the trial court erroneously granted summary judgment to Moran Foods on plaintiff's claim that Moran Foods negligently failed to train Feliciano on the company's cell phone use policy; (2) whether the trial court erred by denying plaintiff leave to amend the complaint to add a claim for punitive damages against Moran Foods; (3) whether the trial court erred by denying Moran Foods' motion for a directed verdict on the remaining specification of direct negligence against it; and (4) whether the trial court committed instructional error either when it gave defendants' requested instruction on amendments to Oregon's mobile communications device law, ORS 811.507, which did not take effect until after the accident, or when it declined to give defendants' requested instruction regarding Leonard's obligation, as a pedestrian, to keep a proper lookout.

## I.  BACKGROUND

### A.  *Substantive Facts*[2]

On the evening of November 1, 2009, Feliciano was driving a company-owned vehicle westbound on SE Foster Road in Portland. His destination was the Moran Foods Save-A-Lot store located on that road. While driving, Feliciano used his company cell phone to contact four different Moran Foods stores, including the store on Foster Road to which he was headed.

---

[2] Because the primary issue before us is the correctness of the trial court's summary judgment rulings, we draw this statement of the facts from the evidence in the summary judgment record and, consistent with our standard of review, state the facts in the light most favorable to plaintiff. We discuss the facts and evidence pertinent to the alleged trial errors identified by the parties in the context of our discussion addressing those alleged errors.

Less than one mile from the store, a marked cross-walk maintained by the city transects Foster Road. Feliciano was aware of the crosswalk from experience. In addition, that night as he was driving, he observed two signs warning him to look for pedestrians as he traveled toward the cross-walk. The crosswalk was demarcated with "ladder bars"— vertical reflective stripes—but some of the ladder bars in the westbound lanes had worn away to varying degrees, with the middle ladder bar in the westbound lanes having worn away completely. The "stop line" that preceded the ladder bar—which indicates where a driver should stop for pedes-trians—also had been worn through to the asphalt in some areas. On that evening, the streetlight above the crosswalk, which was owned by the city and maintained by PGE, was out. The net effect of the faded ladder bars and the lack of lighting was a "dark zone" in a part of the crosswalk span-ning the westbound lanes of Foster Road.[3]

Sometime before 7:25 p.m., Leonard and her room-mate, Jessica Finlay, entered the crosswalk from the north, stepping into the right westbound lane of Foster. Feliciano was approaching the crosswalk at that time, traveling in the left westbound lane of Foster.[4] He was "looking straight ahead" and not talking on or otherwise using his cell phone at the time, although it was lying face up on the passenger seat of his car. He did not see the two women in the cross-walk, and he did not stop. Instead, the right front corner of Feliciano's car struck them both. Leonard died at the scene of the collision from her injuries; Finlay was hospitalized and later died of her injuries.

## B. *Procedural Facts*

Plaintiff initiated this wrongful death action, alleging that the negligence of each of the named defen-dants (Feliciano, Moran Foods, Supervalu, the city, and PGE) caused Leonard's death. As noted, plaintiff dismissed

---

[3] Although two of the ladder bars in the right westbound lane were not com-pletely faded away, the photographs from the accident scene contained in the summary judgment record indicate that the crosswalk markings in that lane were sufficiently faded that they were difficult to see, particularly from a dis-tance, and that that part of the crosswalk was very dark.

[4] There is a dispute of fact as to Feliciano's lane of travel. But, as noted, because the case was resolved by summary judgment as to the city, we must view the evidence in plaintiff's favor on that point.

PGE from the case pursuant to those parties' settlement. Plaintiff's theory of liability with respect to Supervalu, and one of plaintiff's theories of liability with respect to Moran Foods, was that (1) just before the collision, Feliciano received an incoming call on his cell phone; (2) Feliciano's phone, which was lying face up on the passenger seat, illuminated to signal receipt of that call; (3) although Moran Foods and Supervalu had a policy prohibiting cell phone use by employees while driving, they negligently failed to train employees on, or to enforce, that policy; which, in turn (4) caused Feliciano to be distracted from the road as he approached the crosswalk. Supervalu moved for summary judgment, and Moran Foods moved for partial summary judgment. The trial court granted summary judgment to Supervalu on the ground that the evidence on summary judgment was insufficient to permit a reasonable factfinder to find that Feliciano was distracted by his cell phone at the time of the accident and, thus, insufficient to permit a finding that any negligence in training on, or enforcing, the company's cell phone use policy played a causal role in the accident. For the same reasons, the trial court granted summary judgment in part to Moran Foods on plaintiff's claim that Moran Foods was negligent in training on, or enforcing, its cell phone use policy, precluding plaintiff from presenting that theory of liability to the jury.[5]

With respect to the city, plaintiff's primary theory was that the worn-away parts of the crosswalk and, in particular, the faded middle ladder bar, created a "dark zone" at night, impairing Feliciano's ability to see Leonard and Finlay as they moved through that zone.[6] Plaintiff's

---

[5] Plaintiff also moved for leave to amend the complaint to assert claims for punitive damages against Supervalu and Moran Foods based on their alleged failure to train their employees on, or to enforce, their cell phone use policies. The trial court denied that motion on the ground that the case was one of "common negligence."

[6] Plaintiff specifically alleged that the city was negligent in (1) "fail[ing] to inspect, maintain, or repair the stop line to ensure an adequate marking"; and (2) "fail[ing] to inspect, maintain, or repair the crosswalk to ensure adequate crosswalk markings."

In plaintiff's first amended complaint, he had further alleged that the city was negligent in a number of particulars with respect to the streetlight. Those allegations were excluded from the second amended complaint and are not discussed here.

position was that, if the crosswalk had not been in disrepair, the visual contrast provided by the properly maintained ladder bars would have called Feliciano's attention to the crosswalk and to Leonard and Finlay as they moved through the crosswalk, thereby preventing the accident or minimizing the harm caused by it. The city moved for summary judgment. The trial court initially denied the motion, concluding that the summary judgment record was sufficient to demonstrate the existence of a fact question for the jury on causation. However, the court subsequently changed course and granted the city's renewed motion shortly before trial, concluding that it was speculative whether the city's failure to maintain the markings on the crosswalk was a causal factor in the accident. The court then entered a limited judgment dismissing the city from the case.

As mentioned, the case went to trial against Feliciano and Moran Foods. After the trial court denied Moran Foods' motion for a directed verdict on plaintiff's remaining claim of direct negligence against it, the jury returned a verdict, finding Feliciano and Moran Foods negligent and Leonard herself comparatively negligent. The jury allocated fault among the parties as follows: Feliciano (34 percent), Moran Foods (15 percent), and Leonard (51 percent). Because the jury allocated greater than 50 percent of the fault to Leonard, under ORS 31.600(1), the trial court entered judgment for defendants. Plaintiff appealed.

On appeal, plaintiff seeks a reversal of the limited judgment entered in favor of the city and the general judgment entered in favor of Moran Foods, Supervalu, and Feliciano, as well as remand for a retrial against all defendants (that is, all defendants except PGE). Specifically, plaintiff assigns error to the trial court's grant of summary judgment to Supervalu and its grant of partial summary judgment to Moran Foods, as well as its grant of summary judgment to the city. Plaintiff also assigns error to the trial court's denial of his motion for leave to amend to add claims for punitive damages against Supervalu and Moran Foods, as well as the trial court's decision to instruct the jury on a statute regarding motorists' use of cell phones that did not apply to this case. Moran Foods cross-assigns error to the denial of its motion for a directed verdict. In addition,

Feliciano and Moran Foods cross-assign error to the trial court's refusal to deliver their requested jury instruction regarding Leonard's obligation to maintain a proper lookout, patterned on Uniform Civil Jury Instruction 35.04 (2005).

## II. STANDARDS OF REVIEW

The claims of error that we must confront to resolve this appeal implicate several different standards of review.

With respect to our review of the trial court's grants of summary judgment to Supervalu, Moran Foods, and the city, "we view the facts and all reasonable inferences that may be drawn from the facts in favor of plaintiff, the non-moving party," and review to determine "if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 638, 20 P3d 180 (2001) (citing ORCP 47 C). "A genuine issue of material fact is lacking when 'no objectively reasonable juror could return a verdict for the adverse party on the matter that is the subject of the motion for summary judgment.'" *Id.* at 638-39 (quoting ORCP 47 C). Because plaintiff would have had the burden of proof at trial, to withstand defendants' motions for summary judgment, plaintiff had the burden of producing admissible evidence establishing "facts that by themselves or by their reasonable inferences could cause a reasonable juror" to find each element of plaintiff's claim. *O'Dee v. Tri-County Metropolitan Trans. Dist.*, 212 Or App 456, 460-61, 463, 157 P3d 1272 (2007); *see also Hagler v. Coastal Farm Holdings, Inc.*, 354 Or 132, 140, 144-45, 309 P3d 1073 (2013) (discussing a plaintiff's evidentiary burden to avoid summary judgment in a negligence case).

Regarding Moran Foods' cross-assignment of error challenging the trial court's denial of its motion for a directed verdict, which challenged the sufficiency of the evidence supporting the causal connection between its alleged failure to provide Feliciano with driver safety training and Leonard's death, "we review to determine whether there was any evidence from which a reasonable jury could find that it was more probable than not that [the] defendant's alleged negligence *** caused [the] plaintiff's injury." *Trees v. Ordonez*, 354 Or 197, 218-19, 311 P3d 848 (2013).

As to the claims of instructional error, we review a trial court's refusal to give a requested instruction to determine whether the requested instruction is "correct in all respects," whether there was evidence to support it, and whether the requesting party was prejudiced by the omission of the instruction if the party was otherwise entitled to have it delivered. *Hernandez v. Barbo Machinery Co.*, 327 Or 99, 105-07, 957 P2d 147 (1998). Our review of the trial court's decision to give a particular instruction is similar. We review a challenged instruction primarily to determine whether it correctly stated the law applicable to the case and, if not, whether any error in giving the instruction was prejudicial to the party opposing the instruction. *Wallach v. Allstate Ins. Co.*, 344 Or 314, 318-22, 180 P3d 19 (2008).

## III. ANALYSIS

A. *Summary Judgment to the City and Supervalu and Partial Summary Judgment to Moran Foods*

We first address plaintiff's contention that the trial court erred by granting summary judgment to the city and Supervalu and partial summary judgment to Moran Foods. In each instance, the trial court granted summary judgment on the ground that plaintiff had not put forth sufficient evidence to avoid summary judgment on the element of causation. As the Supreme Court has explained, proof of causation in a wrongful death action typically requires "a plaintiff * * * [to] demonstrate that the defendant's negligent act or omission more likely than not brought about the death of the decedent." *Joshi v. Providence Health System*, 342 Or 152, 159, 149 P3d 1164 (2006). However, in circumstances where multiple causes "'concur to bring about an event, and either one of them, operating alone, would have been sufficient to cause the identical result[,]'" the plaintiff need only establish that the defendant's conduct "'was a material element and a substantial factor in bringing it about.'" *Id.* at 161 (citing W. Page Keeton, *Prosser and Keeton on the Law of Torts* 256-68, § 41 (5th ed 1984)). Accordingly, our task on appeal is to assess whether, in opposing summary judgment, plaintiff presented evidence sufficient to create disputes of fact as to whether the particular alleged negligent acts by Moran Foods, Supervalu, and the city were substantial factors in Leonard's death. Specifically, we must

determine whether the summary judgment record, when viewed in plaintiff's favor, would permit a reasonable juror to find that the failure of Moran Foods and Supervalu to train Feliciano on the company cell phone policy, or the city's failure to maintain the markings on the crosswalk, were "substantial factor[s]" in causing Leonard's death. *Id.*; *O'Dee*, 212 Or App at 460-61, 463 (articulating evidentiary burden on summary judgment).

1. *Summary judgment to Supervalu and partial summary judgment to Moran Foods on cell phone policy claims*

We begin with the trial court's grant of summary judgment to Supervalu and Moran Foods on plaintiff's claims based on those entities' alleged negligence in training Feliciano on company policies on safe cell phone use. The trial court did so based on its conclusion that the summary judgment record was insufficient to permit a finding that Feliciano was, in fact, distracted by his cell phone at the time of the accident and, consequently, insufficient to permit a finding that any deficiencies in Feliciano's training about safe cell phone use contributed to the accident. We agree with that conclusion.

As an initial matter, there is no evidence in the summary judgment record that would permit a finding that Feliciano was talking on his cell phone at the time of the accident. The question remains as to whether the summary judgment evidence would permit a reasonable factfinder to find that Feliciano was distracted by his cell phone in some other way. Plaintiff argues that it would, pointing to evidence that Feliciano's cell phone records reflect that Feliciano's phone received an incoming call that went to voicemail near the time of the collision. Plaintiff also argues that evidence of the circumstances of the collision itself—in particular, the evidence that Feliciano did not brake, slow down, or swerve—would permit a finding that he was distracted by his cell phone at the time of the accident.

We disagree. With respect to plaintiff's theory that Feliciano was distracted by an incoming phone call immediately before the collision, there is no evidence that would permit a reasonable factfinder to find that Feliciano received

an incoming phone call at that time. Feliciano testified in his deposition that he did "not recall receiving a phone call" immediately before or at the time of the collision. Feliciano's recollection is consistent with the relevant phone records. Emergency dispatch records show that the incident was reported to emergency dispatch at 7:25:10 p.m., meaning that the accident occurred before that time.[7] Feliciano's cell phone records reflect that he did not receive any incoming calls at or just before 7:25:10 p.m. According to the records, Feliciano ended a call at 7:15:38 p.m. and did not receive or make another call until 7:25:15 p.m.—after the collision was reported to emergency dispatch—when he received an incoming call that went to voicemail.

Notwithstanding that evidence, plaintiff asserts that a reasonable factfinder could infer that the emergency dispatch clock and the cell phone company clock were not set to the same time and, from that inference, could infer further both that Feliciano received the incoming call immediately before the accident and that Feliciano was distracted by it although he did not answer the phone. But, even if the record permits a reasonable inference that the emergency dispatch clock and the cell phone company clock were not aligned,[8] it permits nothing more than guesses as to whether the cell phone company's clock was running ahead of the emergency dispatch clock (rather than the other way around), and as to

---

[7] Although the parties do not rely on it, the summary judgment record contains some evidence suggesting that the collision occurred around 7:19 p.m. The counter clock on a video taken of the area on the night of the accident indicates that the collision occurred at approximately 20:18:47 (or 8:18:47 p.m.). Although it is undisputed that the accident occurred in the 7 p.m. hour, indicating that the clock was set on the wrong hour at the time of the collision, it would not be unreasonable to infer that the counter clock was an hour off, in the light of the fact that, in 2009, the transition from daylight saving time to standard time took place on November 1, the date of the accident. *See* 15 USC § 260a(a) (2009) (establishing that daylight saving time ends at 2:00 a.m. "on the first Sunday of November").

[8] Plaintiff submitted an ORCP 47 E affidavit stating that he could present expert testimony establishing that all clocks are not necessarily aligned, even when those clocks are synchronized with a standard clock:

"An unnamed qualified expert has been retained who is available and willing to testify to admissible facts or opinions creating a question of fact. Specifically, an expert would testify that time stamps differ from computer-clock to computer-clock, and that even if those computer-clocks are occasionally synchronized with a standardized time clock, the computer-clocks over time fall out of sync with a standardized time clock."

whether the incoming call came in immediately before the collision so as to distract Feliciano. *State v. Bivins*, 191 Or App 460, 467, 83 P3d 379 (2004) (inference is not reasonable if it requires speculation or guesswork).

As noted, plaintiff also asserts that the circumstances of the collision themselves would permit a reasonable inference that Feliciano was distracted by his cell phone in some way at the time of the accident. We agree that the circumstances of the collision could support a reasonable inference that Feliciano was distracted by *something* immediately before the collision. However, in the absence of evidence that Feliciano was using his cell phone or receiving a call at the time of the accident,[9] to infer further that the distraction more likely than not was the cell phone in particular, rather than any of the other distractions that the record suggests may have diverted Feliciano's attention from the road in front of him (car stereo, climate control, dashboard GPS, roadside sign, drink of water, his own thoughts) would, again, be just a guess.

In short, the record on summary judgment would not permit a reasonable factfinder to find that Feliciano was distracted by his cell phone immediately before the collision and, consequently, would not permit a reasonable factfinder to find that any failure of Supervalu or Moran Foods to train Feliciano regarding company policy on safe cell phone use was a substantial factor in Leonard's death. The trial court therefore correctly granted summary judgment to Supervalu, and summary judgment in part to Moran Foods, on plaintiff's claim that those entities' negligent failure to train Feliciano on company cell phone use policies caused Leonard's death.[10]

---

[9] We note that the summary judgment record is devoid of evidence that, in 2009, Feliciano routinely used his cell phone for any purpose other than talking, or any evidence that, on the night of the accident, Feliciano was sending texts or e-mails while driving.

[10] Our affirmance of the grant of summary judgment to Supervalu and Moran Foods on the cell phone training claims disposes of plaintiff's fourth assignment of error, pertaining to the trial court's denial of leave to amend to add a claim for punitive damages. That is because plaintiff's proposed claim for punitive damages was predicated on the theory that cell phone use, and the failure to train Feliciano on company policies regarding safe cell phone use, played a causal role in the accident. Accordingly, we reject the fourth assignment of error without further discussion.

## 2. *Summary judgment to the city*

We next address the trial court's grant of summary judgment to the city. On appeal, the city defends the ruling on two alternative grounds. First, the city argues that the summary judgment ruling should be affirmed because a finding that the city's negligence played a causal role in Leonard's death would be inconsistent with the evidence that plaintiff actually presented at trial. Second, the city asserts that the summary judgment evidence would not permit a reasonable juror to find that the inadequately maintained crosswalk markings were a substantial factor in Leonard's death.

We reject out of hand the city's argument that we should affirm the grant of summary judgment based on the evidence that subsequently was developed at trial. On review of a grant of summary judgment, our review is limited to the record that exists at the time of the court's ruling on the parties' motions for summary judgment.[11] ORCP 47 C; *Roe v. Doe*, 161 Or App 477, 486, 984 P2d 344 (1999) ("The relevant record, for purposes of [review of a trial court's grant of summary judgment], is, of course, the record that was before the trial court at the time it considered and allowed the summary judgment motion."). Accordingly, we confine our review to the record as it existed at the time of the trial court's summary judgment ruling and do not consider the evidence at trial in assessing the correctness of that ruling.[12]

Turning to the evidence in the summary judgment record, we are unable to conclude that it would be unreasonable for a juror to find that the city's failure to maintain the crosswalk markings was a substantial factor in Leonard's death. Put

---

[11] On appeal, plaintiff relies on certain evidence that he submitted in opposition to the other defendants' motions for summary judgment, namely, Moran Foods and Supervalu. But, because the city moved for, and renewed its motion for, summary judgment based on "the complete Court file in this case"—and because the city does not challenge plaintiff's reliance on external evidence—this opinion considers the summary judgment record to consist of all evidence submitted in support of, and in opposition to, all of the various defendants' motions for summary judgment.

[12] As plaintiff points out, the evidence at trial may have developed differently if the trial court had not dismissed the city from the case on summary judgment. Once the city had been dismissed from the case on summary judgment, plaintiff had no incentive to develop the evidence of the city's causal role in the accident.

simply, the evidence in the summary judgment record would permit a reasonable factfinder to find that the faded crosswalk markings impaired Feliciano's ability to see Leonard as she crossed Foster Road, causing him to drive into her.

First, the evidence in the summary judgment record would permit a reasonable factfinder to find that Feliciano was looking in the direction of the crosswalk as he approached the intersection. Beyond being a permissible inference based on common experience, *see Skeeters v. Skeeters*, 237 Or 204, 214, 389 P2d 313 (1964), Feliciano himself testified that he observed two pedestrian warning signs as he traveled toward the crosswalk and that he "looked ahead in the direction where [he] was going." He looked specifically for pedestrians, but "didn't see any * * * in the street." Because Feliciano did not see any pedestrians in the crosswalk, he continued "driving straight ahead" through the crosswalk and did not recall applying the brakes.

Second, a reasonable factfinder could also find that the crosswalk markings in the westbound lanes were faded to varying degrees, effectively creating a visual "dark zone" in the westbound lanes of Foster, in which pedestrians were virtually invisible to drivers. Plaintiff presented photographs of the westbound lanes from the perspective of a driver taken the night of the accident and shortly thereafter, and an overhead photograph of the intersection from PortlandMaps.com, taken in 2009. The line-of-sight images reflect that the middle ladder bar had worn down almost completely to reveal the black asphalt beneath, that the ladder bar adjacent to the curb had either partially worn away or become covered with dirt, and that the remaining ladder bar in the right westbound lane was beginning to wear away. The overhead image is even more striking; no trace of white paint is visible from that vantage point, leaving a sizable gap in markings in the middle of the westbound lanes.[13] And another photograph, a still image taken from a video of the crosswalk 17 days after the accident, shows a darkly dressed pedestrian with a darkly colored stroller crossing through

---

[13] Plaintiff also presented an overhead photo of the intersection taken in 2008—when the ladder bar was still in good repair—and the difference between the 2008 and 2009 images is dramatic.

the crosswalk's dark zone. In the absence of an intact ladder bar, it is difficult to discern the pedestrian and the stroller from the expanse of pavement surrounding them; visually, it is as if they are camouflaged so as to blend in with the street.

Third, although there is no direct evidence that Leonard was located in the "dark zone" when she was struck by Feliciano's vehicle, that would be a rational inference on this record. It is undisputed that Feliciano was traveling westbound at the time of the collision and that he did not observe the pedestrians in the crosswalk in advance of the collision. The following additional evidence is also present in the summary judgment record: (a) the victims were leaving the nearby Fred Meyer store and entered the crosswalk into the right westbound lane of Foster Road; (b) a video taken of the area on the night of the accident shows Feliciano's car traveling in the left westbound lane of Foster Road after it passed through the crosswalk; and (c) a photograph shows that the car sustained damage to its front, right-hand side. Although some of that evidence—namely, that Feliciano was traveling in the left-hand lane at the time of the collision— is contradicted by other evidence in the record, if we consider the evidence in the light most favorable to plaintiff, a factfinder could infer that Leonard and Finlay were located in the "dark zone" at the time of the collision and that the right front corner of Feliciano's car collided with them as it entered that area.

Fourth, and finally, a reasonable factfinder could infer that, had the crosswalk markings been properly maintained, thereby eliminating the "dark zone," Feliciano more likely than not would have been able to see Leonard and Finlay as they crossed the westbound lanes of Foster Road, enabling him to take steps to avert the collision or to minimize harm from the collision. In addition to the evidence identified above, the summary judgment record contains evidence that, on the evening of the collision, Leonard was dressed in primarily dark clothes; namely, a black coat, gray pants rolled up to her knees, blue-and-red knee socks, and black boots; and Finlay was wearing a black coat. It also contains testimony from a manager of the street systems division of the Portland Bureau of Transportation that the contrast between a "pretty *** darkly dressed person" and

her surroundings would "likely be better" in the presence of a white ladder bar. When all that evidence in the summary judgment record is viewed in the light most favorable to plaintiff, we conclude that a reasonable factfinder could find that the city's negligence in maintaining the crosswalk markings was a substantial factor in the collision.

The city argued below, and reiterates on appeal, that the faded ladder bar could not, as a matter of law, have had any causal role in the collision, because Feliciano "knew there was a crosswalk and * * * the signs adequately warned him that *he needed to watch for pedestrians.*" (Emphasis added.) But a finding that Feliciano was aware of the crosswalk does not foreclose a finding that the city's failure to maintain the crosswalk was a substantial factor in Leonard's death. Even if Feliciano was aware of the crosswalk, his inability to see its markings and the pedestrians in it could have contributed substantially to the collision that night. Feliciano was not obligated to stop at the crosswalk unless there were pedestrians in it. *See* ORS 811.028. If a reasonable factfinder could find that the city's negligence impaired Feliciano's ability to see Leonard and Finlay in the crosswalk, notwithstanding Feliciano's awareness of the crosswalk, a reasonable factfinder could also find that the city's negligence was a substantial factor in the collision. Thus, even assuming that Feliciano was aware of— and fulfilling—his obligation to look for pedestrians as he approached the crosswalk, that does not preclude a finding that an intact ladder bar more likely than not would have enabled him to see Leonard and Finlay and, upon seeing them, take steps to avoid harming them.

In sum, the trial court erred in granting summary judgment to the city. As a result, for reasons explained further below, we reverse both the limited judgment in favor of the city as well as the general judgment entered following trial, and remand for a new trial against the city, Moran Foods, and Feliciano.

B. *Moran Foods' Motion for a Directed Verdict*

We next address—and reject—Moran Foods' cross-assignment of error challenging the trial court's denial of its motion for a directed verdict on plaintiff's claim that Moran

Foods was negligent for its alleged "failure to adequately train their managers on safe driving practices."[14] Contrary to Moran Foods' argument, viewed in the light most favorable to the jury's verdict, the evidence at trial would permit a reasonable factfinder to find, as the jury found, that Moran Foods' failure to provide training in safe driving practices was a substantial factor in Leonard's death.

In particular, Feliciano's testimony about the amount of driving involved in his job and the effectiveness of safety trainings he had received in areas other than driving would permit a factfinder to find both that Feliciano's job involved a lot of driving and that safety trainings actually affected Feliciano's behavior by increasing his awareness of risks. The testimony of plaintiff's expert witness, Robert Stearns, regarding the use of driver safety training in the business community, would permit a factfinder to find further that Moran Foods' failure to provide driver training to Feliciano did not comport with "best practices" in the business community, which call for providing such training to employees whose jobs involve driving. *See Hansen v. Abrasive Engineering and Manufacturing*, 317 Or 378, 384-85, 856 P2d 625 (1993) (industry standards admissible as evidence of negligence). Stearns also testified about the content and effectiveness of driver safety trainings:

> "And the purpose of safety training is to constantly keep us reminded of the fact that it's not always the way you normally experience it, that you can encounter things that you don't expect, and the only way you can safely avoid being involved in an accident is to anticipate those things, drive defensively, and have an active mindset of constantly looking for trouble on the roadway so that you can avoid it."

That testimony, together with Feliciano's testimony that he was receptive to such trainings, would permit a reasonable juror to further find that it is more likely than not that, if Feliciano had received such training, he would have approached the darkened crosswalk vigilantly, in a manner that would have permitted him to avoid the collision.

---

[14] We address this cross-assignment of error because, were we to conclude that Moran Foods should have been granted a directed verdict on plaintiff's claim of negligent failure to provide driver training, then plaintiff would not be entitled to relitigate that claim of negligence on remand.

Stearns also testified explicitly that Moran Foods' failure to provide Feliciano with driver training was a substantial factor in the collision "for the reasons I just talked about in terms of mental processes and paying attention to driving." In the light of that evidence, we cannot conclude that the jury's verdict was unsupported by the evidence.

Moran Foods also argues that it was entitled to a directed verdict on the negligent driver training claim because, in its view, plaintiff's negligent driver training claim and his vicarious liability claim are, as a matter of law, mutually exclusive. Moran Foods points out that it admitted that it was vicariously liable for Feliciano's negligence and asserts that, as a result of that admission, the negligent driver training claim should not have been submitted to the jury. In support of that argument, Moran Foods relies primarily on *Tuite v. Union Pacific Stages et al*, 204 Or 565, 284 P2d 333 (1955), for the proposition that, if an employer is vicariously liable under *respondeat superior*, the employer cannot, as a matter of law, be liable for negligent training.

We disagree that the Supreme Court's decision in *Tuite* stands for that proposition. In *Tuite*, the plaintiff attempted to hold an employer liable for an employee's negligent driving under both the entrustment doctrine and *respondeat superior*. 204 Or at 574. Because it was undisputed that the employee was acting within the course and scope of employment, the court held that the entrustment doctrine did not apply because that "doctrine comes into play only when the relationship of master and servant or principal and agent between the owner and operator of the vehicle does not exist, or when it does exist, the operator of the vehicle is not engaged at the time upon the business of the master or principal, but is serving his own purposes." *Id.* at 574, 576-77.

We understand the court's holding in *Tuite* to turn on the particularities of the entrustment doctrine, and do not read it to hold that an employer, as a matter of law, can never be both vicariously liable for an employee's negligence and, at the same time, directly liable for its own acts in negligent training. Indeed, the Supreme Court has recognized explicitly, albeit in *dicta*, that an employer can be both

vicariously liable for an employee's negligence as well as directly liable for its own negligence in "hiring, instructing or supervising" the employee. *Vaughn v. First Transit, Inc.*, 346 Or 128, 137-38, 138 n 7, 206 P3d 181 (2009). In view of that *dicta*, we decline to read *Tuite* in the broad manner urged by Moran Foods. Accordingly, the trial court correctly declined to direct a verdict for Moran Foods on plaintiff's negligent driver training claim.

## C. *Instructional Errors*

Finally, because the issue may arise on remand, we address two alleged instructional errors.[15]

### 1. *Instruction on mobile communications device statute*

The trial court instructed the jury on the mobile communications device law, ORS 811.507, a statute which, subject to certain exceptions, makes it a traffic violation to "use a mobile communication device" while driving. The relevant part of the statute took effect after the accident at issue in this case and, consequently, was irrelevant to the jury's evaluation of the case. Nevertheless, concluding that "we might as well clarify that the law" did not apply to the case, the trial court, over plaintiff's objection, instructed the jury as follows:

"Use of Mobile Communication Devices: The Oregon legislature has passed a law under which it is a Class D traffic violation to use a mobile communication device while operating a motor vehicle on a highway in Oregon. This law became effective January 1st, 2010, and does not apply in certain situations, including where the adult driver is using a hands-free accessory or is operating a motor vehicle in the scope of the person's employment if the operation of the motor vehicle is necessary for the person's job. The accident that is the subject of this case occurred on November 1st, 2009."[16]

---

[15] Because we have already determined that the case must be remanded for retrial, we do not address whether the instructional errors were harmless or would, instead, provide independent grounds for reversal.

[16] At the time of the accident, the statute prohibited the use of mobile communication devices only by drivers under 18 years of age. ORS 811.507 (2009), *amended by* Or Laws 2009, ch 834, § 1. The amended version of the statute, which applies to adult drivers, did not become effective until January 1, 2010.

The trial court erred by delivering that instruction. "The objective of the mold, framework and language of [jury] instructions should be to enlighten and to acquaint the jury *with the applicable law.* Everything which is reasonably capable of confusing or misleading the jury should be avoided." *Williams et al. v. Portland Gen. Elec.*, 195 Or 597, 610, 247 P2d 494 (1952) (emphasis added). As a corollary, a jury ordinarily should not be instructed on an inapplicable legal principle, including an inapplicable statute—even if the instruction correctly summarizes the inapplicable law—because an instruction on an inapplicable legal principle risks confusing or misleading the jury by suggesting to it that the principle bears on the jury's deliberations.[17] *Holger v. Irish*, 316 Or 402, 415, 851 P2d 1122 (1993) (trial court erred by delivering instruction that "was correct in the abstract" but "did nothing to inform the jury about the issues that it was to decide"); *Honeywell v. Sterling Furniture Co.*, 310 Or 206, 211-12, 797 P2d 1019 (1990) (error to provide instruction that accurately summarized statute that was not applicable to jury's decision because "the instruction distracts the jury from the appropriate line of analysis"). Here, the risk of confusion created by the instruction was particularly high because the instruction, as formulated, did not, in fact, tell the jury that that statute was inapplicable. Instead, the instruction recited the statute's effective date and the date of the accident, leaving the jury to speculate whether the statute might have any retroactive effect or other bearing on the jury's disposition of the case.

2. *Instruction on Leonard's obligation to maintain a reasonable lookout*

Feliciano and Moran Foods cross-assign error to the trial court's failure to deliver the following instruction— a modified version of Uniform Civil Jury Instruction 35.04—

---

[17] This is not a case in which the trial court delivered the instruction to correct an erroneous impression of the law created by an argument by a party, or in response to a jury question indicating that the jury was, in fact, confused about whether the inapplicable statute had some bearing on the case. Faced with those types of indicia of actual or likely juror confusion, a trial court can, of course, with consultation from the parties, craft an appropriate instruction to redress that actual or likely confusion.

regarding Leonard's common-law obligation to maintain a reasonable lookout:

> "It is the continuing duty of a driver of a motor vehicle or a pedestrian to keep and maintain a reasonable lookout for other vehicles or persons on the street or highway.
>
> "A reasonable lookout means such as would be maintained by a reasonably prudent person under the same or similar circumstances.
>
> "In determining this question you should take into consideration the extent or degree of danger reasonably to be expected. A person does not comply with the duty to keep a reasonable lookout by simply looking and not seeing that which is plainly visible and which would have been seen by a reasonably prudent person under the same or similar circumstances."

Although plaintiff does not rely on it on appeal, our decision in *Vandeveere-Pratt v. Portland Habilitation Center*, 242 Or App 554, 259 P3d 9 (2011), precludes the conclusion that the trial court erred in declining to deliver the modified instruction requested by defendants. There, we held that the trial court committed legal error by delivering an almost identical instruction for the purpose of explaining a plaintiff's common-law obligation to maintain a reasonable lookout for her own safety. *Vandeveere-Pratt*, 242 Or App at 564. In particular, we reasoned that the third paragraph of the instruction requested by defendants in this case, when given to the jury to explain the scope of a plaintiff's duty to keep a reasonable lookout for her own safety, erroneously implied to the jury that a plaintiff can assume the risk of a defendant's negligence, contrary to the legislature's abolition of the doctrine of implied assumption of risk. *Id.* at 564-65; *see* ORS 31.620(2) ("The doctrine of implied assumption of the risk is abolished."). In the light of *Vandeveere-Pratt*, defendant's proposed jury instruction was not "correct in all respects." *Hernandez*, 327 Or at 106. The trial court therefore correctly declined to deliver the instruction.

D. *Remedy*

As noted above, our conclusion that the trial court erred in granting summary judgment to the city requires us

to reverse both the limited judgment dismissing the city and the general judgment entered after trial, and to remand for a new trial. However, the parties disagree as to the scope of the new trial. Moran Foods and Feliciano argue that we should order a new trial as to the city only, and leave intact the jury verdict as to them. Plaintiff argues that the case should be "remanded for trial as to all parties, at least as to the questions of comparative fault." Plaintiff suggests that, as to Moran Foods and Feliciano, the new trial be limited to the apportionment of those parties' fault and damages only, whereas the trial against the city should address "all issues."

We conclude that a new trial is required as to all defendants on all issues. As a result of the trial court's erroneous decision to grant summary judgment to the city, the jury did not consider the city's role in the accident. We are unable to conclude that the jury's verdict likely would have been the same on any issue, had the city been a party at trial. As plaintiff points out, having the city in the case will change how the case is litigated before the jury by all parties:

> "[T]he [c]ity's liability for the faulty crosswalk was not at issue in the trial, and accordingly the remaining parties could not and did not litigate that issue. There is no basis for [the] assumption that the evidence presented in the trial without the [c]ity is the same evidence that would have been presented against the [c]ity."

Accordingly, we remand for a new trial on plaintiff's claims against Feliciano, Moran Foods, and the city, except for plaintiff's claims against Moran Foods based on cell phone use and training. *See Brooks v. Bergholm*, 256 Or 1, 6, 470 P2d 154 (1970) (reversal required where court "cannot say that [error by the trial court] did not affect the jury's verdict").[18]

## IV. CONCLUSION

The limited judgment is reversed, the general judgment is reversed in part, and this case is remanded for a

---

[18] As is always the case, if the parties wish to limit the issues to be tried on remand based on their experience at the first trial or for other reasons, they may do so by agreement.

new trial against defendants Feliciano, Moran Foods, and the city.[19]

      Limited judgment reversed; general judgment reversed in part; remanded for further proceedings consistent with this opinion.

---

[19] Because we have affirmed the grant of summary judgment in favor of Supervalu, there are no claims to be tried against Supervalu on remand; in addition, as was the case at the first trial, there are also no claims to be tried against PGE, in the light of plaintiff's settlement with PGE.